----

(No. 13796.—Judgment reversed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM J. CRAMER, Plaintiff in Error.

*Opinion filed June 22, 1921.*

1. CRIMINAL LAW—*burden is on People to prove commission of crime by defendant beyond reasonable doubt—evidence.* The burden rests upon the People to prove that the defendant committed the crime set forth in the indictment, by proof, beyond a reasonable doubt, of all the material and essential facts constituting the crime, and for the purpose of making such proof evidence of all facts which afford any reasonable inference as to the existence of the ultimate material facts is admissible.

2. SAME—*materiality of evidence is for the court.* Any fact which, by itself or taken in connection with other evidence in the case, tends to prove the guilt of the defendant is admissible, but the question of relevancy and materiality of the evidence is for the court and not for the jury.

3. SAME—*when instruction as to reasonable doubt is improper.* The reasonable doubt which the jury may entertain must be as to the whole evidence and not as to any particular fact, but an instruction stating said proposition should not conclude with the expression, "and not as to any particular fact in the case not material to the issue," without informing the jury what are the essential material facts, as it is not proper to submit to the jury the question of what facts are material.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ANTON T. ZEMAN, Judge, presiding.

EVERETT JENNINGS, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Plaintiff in error, William J. Cramer, was convicted in the criminal court of Cook county of the crime of robbery and was sentenced to the penitentiary. The record has been brought to this court by writ of error.

The indictment charged that the defendant with a deadly weapon robbed George Gunkel of $26, lawful money of the United States, and that a robbery was committed was proved. Gunkel was the owner and in charge of a building at 3800 Armitage avenue, in Chicago, in which he had conducted a saloon but which had become a restaurant and soft drink parlor, and at 11:55 in the night of Saturday, September 20, 1919, the robbery occurred at that place. The persons present at the time were Gunkel and four or five men who were sitting at a table, one of whom was drawing pictures of the army for the entertainment of the others. Gunkel was putting the finishing touches on a nut sundae when two men came in at the front door, one of whom was a heavy-set man, and he told Gunkel to throw up his hands, which he did. About the same time three men came in from the side door, one of whom had two revolvers and the others each had one, and they threatened Gunkel and the men at the table. The heavy-set man went behind the bar and asked Gunkel how to open the drawer of the cash register, and Gunkel told him by pressing a key. The

man took $26 from the drawer and all the men went out of the south door.

The verdict depended upon the identification of the defendant, Cramer, as one of the men who committed the robbery, and on that subject Frank Lindlaw and Emil C. Scheffler, who were sitting at the table, and Gunkel, testified that the defendant was one of the men who came in the side door and that he was the one who had two revolvers which he flourished around. Gunkel testified that about 10:30 o'clock on Monday evening after the robbery he went to the Warren avenue station with two others and saw the defendant there; that he had not known the defendant before, and the defendant was then brought out for identification; that the officer made the defendant go through different things and asked him different questions and asked Gunkel and the others whether they could identify him; that they did not then identify him but told the officer they would be back the next day, and that they went back the next day and identified the defendant as the same man who was in the saloon at the time of the robbery. Lindlaw and Scheffler testified that they were sitting at the table where Arthur Kern was drawing pictures from the army, and that the defendant was one of the men who came in at the side door and flourished the two revolvers. The witnesses said that the defendant was dressed in dark clothes and had on a dark cap.

The defendant testified that his business was that of shipping clerk for Hibbard, Spencer & Bartlett, and that he had never been at 3800 Armitage avenue and had never seen Gunkel and had no connection with the robbery in any manner. He denied categorically each item of evidence for the People so far as he was concerned and gave an account of his whereabouts and actions on September 20 and that night, and testified that at the time of the robbery he was at the corner of Madison street and Hoyne avenue, several miles from the place of the robbery. He testified

that he was not at work on the 20th on account of pleurisy, and that on that day he went to the bureau for disabled soldiers, at 15 West Monroe street, and got a check for $50 from the Salvation Army; that he went to the Masonic Temple, at Randolph and State streets, between 11 and 12 o'clock and bought a cap, shoes and suit of clothes with the check; that the suit was brown and the shoes black; that he put on the suit at home but did not wear the shoes because they hurt him, and wore the suit with tan-colored army Camp Grant shoes and a gray Fedora hat; that in the evening he was at a cigar store until about 8:30, where he met witnesses who testified in his behalf; that he spent the evening at other places and at the time of the robbery was at the corner of Madison street and Hoyne avenue, which was proved to be somewhere from five to seven miles from the place of the robbery, and that he went home at 1:30 in the morning.

Charles Doherty testified that he was a book-keeper for the Federal Reserve Bank; that he had known defendant about five years; that he saw the defendant before eight o'clock on Saturday evening, September 20, and left him about eight o'clock and went to a skating rink; that he left the skating rink about 11:15 and met the defendant and some friends, and last saw the defendant at twelve o'clock at the corner of Hoyne avenue and Madison street, about seven miles from 3800 Armitage avenue, and that the defendant had on a new brown suit, a light hat and army shoes.

F. Leo Trainor testified that he was a clerk in the main post-office in Chicago; that he had known the defendant six years and saw him on the evening of September 20 about six o'clock; that the witness went to the skating rink; that he saw defendant last about twelve o'clock at Station B post-office, at Hoyne avenue and Madison street, between six and eight miles from 3800 Armitage avenue, and that the defendant had on a new brown suit, a gray

hat and army shoes, and it was five minutes after twelve o'clock when he left the defendant.

Eugene Harrison, a chauffeur for the Commonwealth Edison Company, who had been a mail carrier and knew the defendant, testified that he saw him at the corner of Madison street and Hoyne avenue at twelve o'clock, and that the witness went into a restaurant across the street and saw the defendant last about one o'clock.

Norman E. Burke testified that he was an ironworker; that he was in the cigar store mentioned by the defendant and saw him there about eight o'clock, and saw him last at twelve o'clock when the witness went home, and the defendant was then on the corner at the post-office at Madison street and Hoyne avenue and had on a new dark-brown suit, a gray Fedora hat and a gray tie.

Alphonso Junquera testified that he was a fireman for the LaSalle Phonograph Company; that he saw the defendant on September 20 at 11:30 o'clock at night at the post-office as the witness came from the skating rink and saw him there until about a quarter after twelve o'clock, and he had on a new suit, which he showed to the witness.

The robbery had taken place on Saturday night, and it had been reported on Monday night that the defendant had been arrested, and the witnesses talked over the events of Saturday night when they were fresh in mind. A witness for the People in rebuttal testified that it was four and one-half miles from the corner of Hoyne avenue and Madison street to 3800 Armitage avenue.

In the argument for the People it is stated that the witnesses for the defendant were reputable persons, and no fact or circumstance is pointed out or appears in the record tending in any way to discredit them. They had no relation with the defendant and could not be affected, directly or indirectly, by the verdict. A very unfair cross-examination was permitted, by which witnesses were asked to tell where they were on various dates selected at ran-

298—33

dom covering a year previous to the robbery, not connected with any holiday or circumstance and concerning which no witness could be expected to testify. The witnesses were positive and circumstantial in their testimony, and the witnesses for the People failed to identify the defendant at the first visit to the police station, when an officer asked the defendant different questions and made him go through different things for the purpose of identification. There were five participants in the robbery, so that attention was not concentrated on any particular one except the heavy-set man who ordered hands up and was the principal actor. The argument for the People is that the jury were especially qualified by hearing the witnesses and observing their appearance and demeanor to judge of their credibility, which is true, but nothing appears in the cross-examination or otherwise affecting either the character or credibility of the witnesses, and, allowing to the jury all the advantage of seeing and hearing the witnesses, it must be said that a consideration of the record leaves the mind in considerable uncertainty as to the defendant's guilt, which must be established with reasonable certainty. It cannot be said with confidence that a reading of the record leaves the mind in such a condition that one can say that it produces an abiding conviction to a moral certainty of the defendant's guilt.

The court gave to the jury an instruction defining robbery in the language of the statute but no other information as to the essential and necessary facts constituting a crime. A comprehensive instruction was also given on the subject of reasonable doubt, which was free from objection, but another instruction was given relating to reasonable doubt and concluding with this statement: "The reasonable doubt that the jury is permitted to entertain to authorize an acquittal, must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case not material to the issue in the case." The instruction is the same as one given in *People* v. *Seff,* 296

Ill. 120, and it submitted to the jury the legal question as to what were the material facts or final essential elements of the crime with which the defendant was charged. The burden rested upon the People to prove the commission of the crime set forth in the indictment, by proof beyond a reasonable doubt of all the material and essential facts constituting the crime. For the purpose of making such proof, evidence of all facts which afford any reasonable inference as to the existence of the ultimate material facts is admissible, and that question is for the court. Any fact which by itself or taken in connection with other evidence in the case tends to prove guilt is admissible, but the question of relevancy and materiality is for the court and not for the jury. It has often been said that the reasonable doubt which the jury may entertain must be as to the whole evidence and not as to any particular fact. (*Mullins* v. *People,* 110 Ill. 42; *Bressler* v. *People,* 117 id. 422; *Hornish* v. *People,* 142 id. 620; *Williams* v. *People,* 166 id. 132.) While the jury are judges of both law and fact, it is not proper for the court to submit to the jury the question of what facts are material, since the jury might regard some facts which had been proved as not material to the issue, and such an instruction ought not to be given without in some way definitely informing the jury what are the essential material facts constituting the crime with which the defendant is charged. Whether such an instruction would be ground for reversal might depend upon the state of the record, which might or might not raise an inference that the jury had been mistaken in their view of the law as to what was material.

The proof that the defendant was not at the place of the robbery and could not have participated in it was complete, came from unquestioned sources, and was unaffected by any fact or circumstance or by any testimony except the discredited claim of identification.

The judgment is reversed.          *Judgment reversed.*