THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RAYMOND COSTELLO, Plaintiff in Error.

*Opinion filed February 18, 1926.*

1. CRIMINAL LAW—*when court must decide, as a preliminary, question, the admissibility of a confession.* An admission or confession of a defendant to which no objection is made is admissible without any preliminary proof, but if objection is made the court must hear, out of the presence of the jury, such evidence as either side may present as to the circumstances of the confession, and the decision of the court that the confession was voluntary and admissible will not be reversed unless manifestly against the weight of the evidence or unless there has been an abuse of discretion.

2. SAME—*the court need not be convinced, beyond a reasonable doubt, that confession was voluntary.* In determining, as a preliminary question, whether a confession of a defendant was voluntary and admissible the court is not required to be convinced, beyond a reasonable doubt, of the voluntary character of the admission, and although there may be evidence of threats or promises made to influence the making of the confession, if there is sufficient in the facts and circumstances proved to show that the confession was voluntarily made there is no abuse of judicial discretion in allowing it to be proved.

3. SAME—*jury must determine credibility of witnesses.* It is the province of the jury to determine the credibility of all the witnesses, including those whose testimony tends to prove an alibi, to accept such part as they believe to be true and reject such part as in connection with all the evidence in the case they believe to be false, and to render a verdict according to the weight of evidence.

4. SAME—*when instruction as to reasonable doubt is improper— reversal.* An instruction that the reasonable doubt the jury may entertain to authorize an acquittal must be as to "the whole evidence and not as to any particular fact in the case not necessary to constitute the crime charged," is improper unless the jury are definitely informed as to what are the essential material facts constituting the crime; but such instruction will not be ground for reversal where the jury could not have been misled in view of the evidence in the case and the conclusive proof of defendant's guilt.

5. SAME—*when an instruction as to credibility of witnesses is properly refused.* An instruction informing the jury that they have no right to disregard the testimony of a witness simply because he testifies on behalf of the defendant is properly refused, as it applies only to the witnesses for the defendant while the rules in

regard to the credibility of all witnesses are the same, no matter on which side they testify; and it is improper to give a general instruction calling attention to the witnesses of one of the parties, emphasizing the fact that the jury have no right to disregard the testimony of such witnesses.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES A. WILLIAMS, Judge, presiding.

JAY J. MCCARTHY, (CLYDE C. FISHER, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and VIRGIL L. BLANDING, (EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Raymond Costello was convicted in the criminal court of murder and sentenced to death, and a writ of error has been allowed to review the judgment.

On the morning of July 10, 1925, at about 6:45 o'clock, Frank Giddis, a milkman, found the dead body of Madeline White, a sixteen-year-old girl, nude from the waist to the knees, under the front porch at 5931 South LaSalle street, in the city of Chicago. He telephoned to the Englewood police station and stayed by the body until the police came. Dr. Joseph Springer, who was a coroner's physician and deputy coroner, arrived soon. The body was removed to a morgue, where it was identified by Madeline's sister, Genevieve. The doctor removed a man's blue and white polka-dot handkerchief which was deeply imbedded in her mouth back of the larynx, about two and a half or three inches, so firmly that it required some force to remove it. The doctor made an examination of the body and its various organs. It is unnecessary to describe their condition. The doctor arrived at the conclusion that the girl was a

virgin, and the evidence leaves no doubt that she had been ravished and murdered. The doctor's opinion was that her death was caused by strangulation by means of the handkerchief in her mouth and windpipe, and that she had been dead from four to six hours at the time he made his examination, about 7:30 in the morning, and on cross-examination he stated that he thought the time of death was between eleven o'clock at night and one o'clock in the morning, which would be from six and a half to eight and a half hours before his examination.

Madeline and her sister, Genevieve, twenty years old, lived at 6045 South LaSalle street. They had been with Costello and Andy Brick on the streets in the neighborhood of their home the night before, and Genevieve left her sister and the two men together at LaSalle and Sixtieth streets a few minutes before eleven o'clock and did not see her again alive. Costello was a young man twenty-two years old, who was living with his father and mother at 5620 South Wells street. He had been confined in the State reformatory at Pontiac from May 4, 1923, upon his conviction for stealing an automobile, until November 21, 1924, when he was paroled. He was arrested at his father's home, where he was in bed, asleep, about 8:30 o'clock the same morning the body was discovered. There was mud on both knees of his trousers and fresh dirt on the shoulder, elbows and wrists of his shirt. On coming from his bedroom he asked his mother where the handkerchiefs were, and on being told, got one and wiped the sweat from his face. On being taken to the police station after his arrest Costello was interrogated by officer Barry. He told Barry that he had been with Andrew Brick and the two White girls the night before. He said that Brick lived on Shields avenue but he did not know the number. Barry took him over to Shields avenue in a car and he pointed out Brick's home. Brick was not at home, and Barry took Costello back to the station and left him in charge of officer Lee.

320–6

He then found and arrested Brick and took him back to the station where Costello was and brought them together. Costello said that Brick had left him about 10:30 the night before; that Genevieve had left and he and Madeline and Brick had walked north to Sixtieth street, where Brick had left them; that after he left, Costello took Madeline over to Washington Park, where he tried to have sexual intercourse with her. He was chased out of the park and went back to Fifty-ninth and LaSalle streets, where he was talking to Madeline when a man named Mulholland, whom he had seen previously that evening at Fifty-ninth and Wentworth streets, came up to him and asked him if he got his. He said no. Mulholland said, "Well, let me take her," and then said, "Let's take a walk," and he and Mulholland and Madeline walked south from Fifty-ninth and LaSalle and got in front of 5931, when Mulholland came over and asked him for his handkerchief. He said he pulled it out and gave it to Mulholland, and Mulholland put his arm on Madeline, pulled her toward him, struck her and pulled her in between the houses, 5929 and 5931. Mulholland called him, and he went over and took Madeline by the legs and helped carry her underneath the stairs. He said when he was leaving, Mulholland was coming around toward the feet of Madeline. He went out and sat on the steps and some minutes afterward Mulholland came out. He asked Mulholland if he got his, and Mulholland said, "Yes, but I had a hard time getting it." Barry testified that Costello had mud on both knees and Barry asked him where he got it, and he said he tried to have intercourse with her in the park and that was where he got it. He said Mulholland had sexual intercourse with her. No objection was made to this testimony. On cross-examination Barry was asked if he did not strike or hit Costello or did not sideswipe him on the head, and he said he did not. No other suggestion was made of any violence offered to Costello or that his statement was not made of his own free will.

Michael Romano testified that he is an assistant State's attorney and that he had a conversation with Costello that same day, July 10, at the Englewood station, beginning about 1:15 in the afternoon, in which he told Costello who he was and that he was sent to investigate the murder of Madeline White; that under the law Costello did not have to talk to him and there was no one compelling him to make a statement, but if he had anything to say Romano would be glad to hear it and would protect his rights as best he could. In answer to Romano's question Costello said that he was married but was living with his father and mother; that he knew Madeline in her lifetime and knew Genevieve about eight or nine years in the neighborhood there; that he saw Madeline on the night of July 9; that the day before he called up the White home, gave his name as McCarthy, represented himself as a police officer, and said that he had some complaint about the White home either for the sale of intoxicating liquors or because it was a disorderly house; that he was coming over to see Madeline, and it would be to her interest and the interest of her sister to see him and talk with him. He made no definite appointment at that time.

Here, at the suggestion of Costello's counsel, the court and counsel withdrew to the judge's chambers, out of the presence of the jury, where Romano and Costello were interrogated by Costello's counsel, and in response to such interrogation Romano testified that no promise was made to the defendant that if he helped clean up the situation Romano would guarantee that he would be well taken care of when he got over north; that there were several policemen in the room, some of whom he did not know. He named those whom he knew. Costello was then examined out of the presence of the jury and testified: "I remember being present at the Englewood police station when Mr. Romano was there. Mr. Romano, Mr. Theiry and Mr. Lee were talking to me about the case. Before Mr.

Romano arrived there Mr. Barry wanted me to make a statement and sign it. I said I did not want to sign the statement he wanted me to sign. When Mr. Romano came in he talked to me awhile. Then he and Captain Lee left the office and went outside. Mr. Romano came back, and he says, 'You understand we are working to clear this case up. You can be a whole lot of help to us in a way. Can you turn up these fellows on this murder charge?' I said, 'I wasn't on it.' He said, 'If you will turn up these people and help us clean up this murder charge I will guarantee you will be well taken care of when you get over north.' Mr. Romano said that. I asked him what he meant be well taken care of. I told him all I knew about the charges and he wanted more. So he made a statement out—a written statement. Mr. Romano dictated it while another man made it up. At the end he handed me the paper and asked me if I wanted to sign it, and I said no. So he said, 'There is only one white thing for you to do. If you never did a white thing before in your life you can sign that statement.' I said I didn't want to. He said, 'Your mother and your wife are both locked up in the detention home.' Mr. Romano said that, and he said, 'Do you want to see them locked up all of the time when you can sign this and have them released?' I said I did not want to sign it." Thereupon Romano testified that no such statements were made. He did not say anything like that. In fact, they came down to the State's attorney's office and the wife was permitted to talk to her husband alone. The jury having returned, Romano was recalled to the stand and proceeded with his testimony, Costello's counsel stating, "I want the record to show my objection." The objection was overruled.

Romano continued that Costello, in describing his movements on July 9, said he went to the White home and talked to Genevieve. About four o'clock on July 9 he called Madeline on the telephone, talked to her and made

an appointment to call later in the evening; that a boy named Andy Brick, who had just been released from Pontiac and had just got home that day, came into the confectionery where he was talking. They had been friends in Chicago. He said that he and Brick had been sentenced to Pontiac at the same time for the theft of the same automobile; that Costello had been released four or five months before Brick. He told Brick about his appointment with the White girls, and went with Brick to the drug store and called up Madeline about 8:00 or 8:30 in the evening. He and Brick went to the White home, where they met Genevieve and Madeline on the sidewalk, talked to the girls and arranged to take them out walking. He was talking to Madeline and Brick to Genevieve. The four of them started toward Sixtieth and LaSalle streets, and just before they got to the corner Genevieve left, leaving the three standing there. Brick and Madeline talked for a short while, and when they got to Sixtieth and LaSalle Brick bade them good night. After Brick left, Costello and Madeline walked to Washington Park. They got there about 9:45 or 10:00 o'clock and sat on a bench. Costello said he tried to get Madeline to have sexual intercourse with him but she refused. It was then about 11:00 o'clock. A park policeman came up and told them to get out. They left the park, walked along the boulevard, got to Fifty-ninth and LaSalle and stopped there for awhile and talked. Madeline at that time was ready to go home. As they stood there a man by the name of Mulholland walked in their direction and stopped to talk with them. Costello said that Mulholland called him to one side and asked him how he had got along with Madeline; that he wanted to know if he had got what he wanted, and Costello said he had not; that she refused to have intercourse with him in the park and was now going home. Mulholland said, "Well, let me take a chance at it; let me see what I can do." The

three of them then started south from Fifty-ninth street
and came between 5929 and 5931 LaSalle street. He said
he sat on the iron rail which enclosed this parkway, some
five feet from Mulholland and Madeline, who were talk-
ing; that Mulholland came up to him and asked him for
his handkerchief; that he had a blue polka-dot handker-
chief which he took from his pocket and handed Mulhol-
land. Mulholland returned to Madeline, and Costello said
that the next thing he saw was Mulholland giving the girl
the arm; that he put his arm around her neck and forced
this blue handkerchief down her throat because she started
to scream, and he called to Costello for assistance. Mul-
holland grabbed the girl by the arms and shoulder and Cos-
tello grabbed her by the feet, and they carried her under
the stairway at 5931 LaSalle street. He said at that time
the body was limp and he believed she was unconscious
because she no longer screamed. They placed the body
under the stairway and the last he saw was Mulholland
raising her dress. He came out and sat on the stairway.
He heard no noises as he sat there and did not look back
to see what Mulholland was doing. He had no curiosity
about her and did not think it necessary to go back. He
waited some five or ten minutes and Mulholland came and
they started for Fifty-seventh and Wells. They were go-
ing home. He said the only conversation he had with Mul-
holland was to ask him "if he got his meat." He said by
that he wanted to know if Mulholland had intercourse with
Madeline, and Mulholland said yes. Costello asked him if
he had any trouble, and he said, "Yes, I had to take it
away from her; she would not give up." They separated
at Fifty-seventh and Wells about one o'clock in the morn-
ing. He had known Mulholland four or five years. He
was a young man about twenty-four years of age, rather
light complexion, rather slender, weighing about 140 or
145 pounds. Costello said he had no reason to implicate
Mulholland, no motive of revenge, no quarrel, no disturb-

ance of any kind that would cause him to name Mulholland as the boy who had actually committed the rape and murder of Madeline. He was asked why he told so much of the affair and of his participation in the crime and did not tell all of it, and why he fastened the actual killing on Mulholland, having no motive of revenge against him, and he said, "Well, I have told that much of it because when I go to the north side I may be able to cop a plea." Romano asked him what he meant, and he said there were so many who came to the north side who were able to plead guilty and get off lightly. Romano asked him what he considered himself guilty of, if anything,—for carrying Madeline or assisting in placing her under the porch,—and he said he knew he was guilty of accessory before the fact. Romano asked him if he had experience with legal terms, and he said from his lawyer in other cases he had learned something about accessories. Romano asked him if he felt that the law would be justified in giving him fourteen years or life imprisonment for the part he took in the crime, and he said, "Yes; that is better than having my neck stretched, isn't it?" Romano asked Costello if he objected to making a statement or answering questions, which would be reported by the captain's secretary, and he said he had no objection but did not want to sign anything. Romano said, "You are not compelled to sign anything; you are not compelled to say anything if you think it advisable not to; there is no one here who can offer you any immunity; there is no one here who can make your sentence lighter; all I am here for is for the purpose of investigating this matter." He made a statement that was written down, which Romano offered to him and asked him if he cared to sign it, and he said no. Romano said that he had some conversation with Costello about the handkerchief later, about three o'clock the same day. He showed him the handkerchief which Dr. Springer had taken from Madeline's mouth and asked him if he had seen it before. He

said, "Yes; that is the handkerchief that I gave to Mul-
holland on the night of the 9th, when he asked me for a
handkerchief." Romano then went with Costello in the
captain's car to 5931 LaSalle street with Captain Lee, Ser-
geant Barry and officer Ward. There were about twenty
or thirty citizens around when they got there. Costello in-
dicated the rail on which he sat while Mulholland talked
to Madeline and the spot under the stairway where the
body lay.

Captain Lee was then called as a witness and was asked
about a conversation with Costello on July 10, and the
objection was made that the conversation was incompetent
because the statements or admissions made were obtained
by duress and by promises. Thereupon Costello was again
examined out of the presence of the jury and testified as
follows:

"When I was arrested at Englewood station, present
were Captain Lee, Mr. Barry, a man I don't know his
name. Altogether there was about nine or ten officers pres-
ent. They took me up-stairs. Somebody hit me at the
station,—the man that arrested me did. I was sitting in a
chair and he told me to stand up against the wall, and he
hit me like this (indicating). When I went over he shoved
me in the corner. Barry shoved me like that, on my head.
I was hit constantly on the head while I was in there (in-
dicating). I was hit by him (indicating) in the presence
of the other officers. Captain Lee was there part of the
time. There was other officers there that are not present
now.

The court: "Why didn't you say something about that
this morning, when you were here?

A. "Well, they didn't hit me while Mr. Romano was
there. I didn't have a chance to tell my counsel while
Barry was on the stand this morning. I have talked to
my counsel once about the case. At that time I told him
I didn't make a confession. I told him I was hit. I couldn't

say myself how many times I was struck. I· didn't know the name of the man who struck me. I didn't tell Michael Romano that I was not struck.

Captain Lee: "Your honor, while I was there there was nobody put a hand on him,—not at any time while I was in the room,—and after I went up-stairs to talk to him I had him taken down to my office down-stairs, and I talked to him later on down there; and I was there most of the time until Romano came, because I called George Gorman up and asked him to send an assistant State's attorney out, and I had him brought down-stairs and I had him in my office.

The court (to police officer): "Were you there, officer?

An officer: "Yes.

Q. "All the time?

A. "Yes.

Q. "Well, did you hit him?

A. "No.

Q. "Or punch him?

A. "No, sir; I never seen anybody lay a hand on him, and I was with him for eighteen hours.

Q. "Did you see Ward, the officer that is now on a furlough or away, did you see him strike him?

A. "No, I did not.

Q. "Or Barry?

A. "No, sir.

Mr. McCarthy: "Well, you were not present at all the time when Barry and Ward might have done anything over there?

The officer: "I was present all the time, was detailed all the time, except when I went to the toilet or to get a sandwich.

Mr. McCarthy: "Well, while they were in there they could have hit him.

The officer: "Your honor, he told Mr. Romano and Gorman also that I was not in there.

The witness Costello: "Mr. Gorman gave orders to Mr. Lee that I should not be hit at the Englewood station.

Mr. McCarthy: "When was that?

A. "About two o'clock in the morning.

Q. "Of what day?

A. "Saturday morning.

Q. "Did you complain to Mr. Gorman that you had been hit?

A. "Yes, and he gave orders to Mr. Lee that they should not hit me.

Mr. McSwiggin: "You complained to Mr. Gorman and told him where you were struck?

A. "Yes.

Q. "And you told the doctor and showed him where you were kicked?

Mr. McCarthy: "Did you say you were kicked, to anybody?

A. "Yes.

Q. "Where?

A. "In the side.

Q. "How were you kicked?

A. "He shoved me in the corner and I tried to cover up, and I was kicked in the side. I told Mr. Gorman—

Mr. McSwiggin: "Now, just a moment ago, when you said they struck you, you didn't think of being kicked—

A. "I told you I was hit.

Q. "But you didn't think of being kicked until it was suggested by me to you, did you?

An officer: "Didn't you tell Mr. Gorman I wasn't in there at the time you were struck?

A. "No, I pointed you out and that other fellow.

The officer: "No, you pointed out Ward.

Mr. McCarthy: "On the showing made I would like to make an objection to the testimony going in.

The court: "All right. Objection overruled.

Mr. McCarthy: "Exception."

Thereupon Captain Lee testified, in the presence of the jury, to the statement made by Costello substantially the same as Barry and Romano. He also testified that after the conversation with Costello in the afternoon of the same day he was taken in a machine to the morgue, where he was asked if he could identify the girl at the morgue, and he said, "Yes; that was her." Then he said something like he "would like to kill the son-of-a-gun that done that." He denied that he had anything to do with it. He was then taken to 5931 LaSalle street, where the body was found. Romano and Sergeant Barry were also with him. Costello pointed out the rail where he sat while Mulholland talked to Madeline and the spot under the porch where they laid her. Twenty or thirty people were there. Raymond Budinger, Marion Budinger, Mrs. Patrick McNamara and Margaret Dooley testified that Costello was there at that time with the police and that he said that was where he put her, indicating under the porch.

Barry made inquiry for Mulholland, and William Mulholland, who lived at 5700 Justine street, testified that he was twenty-four years old, had known Costello about five years, and saw him on Wentworth avenue with Brick on July 9, about 8:00 or 8:30 o'clock, but had no conversation with him. The next time he saw Costello was in the State's attorney's office. Gorman asked Costello, "Is this the fellow?" and Costello answered, "No; that is not the fellow." Mulholland did not know of any other Mulholland in that vicinity. Officer McShane made a search for Mulholland, using the telephone and city directories, and investigated a number of families of that name, but none of them answered Costello's description.

Michael Roesch, a South Park police officer in Washington Park, testified that he saw Costello on July 9. He did not know him previously. It was about eleven o'clock at night and Costello was with a girl, sitting on a bench. Roesch told him that nobody was allowed in the park after

eleven and it was time to be going. He said, "All right, officer," and they got up and went away. He next saw Costello on Sunday evening at the Englewood police station. He came out of the cell and an officer asked him if he knew Roesch, and he said, "Yes; I think that is the fellow who chased me out of the park." He said, "You acted very decent about it; I was over there trying to do something but I couldn't do it, so I sat on the bench, and when you told me to go along I beat it out of the park."

Costello called four witnesses to testify to his reputation as a man of good moral character, and four witnesses to testify as to where he was after 11:30 on July 9. Joseph Gallagher, a switchman, testified that he had known Costello ten or twelve years; that on July 9 he saw him at Fifty-ninth and LaSalle streets about 11:30 in the evening, with a girl and another man, neither of whom Gallagher knew. Costello spoke to him and he answered. Costello said, "Wait a minute; I am going in your direction." They went to Fifty-ninth and Wentworth, where Gallagher took a car going south and Costello went north. Catherine Cronin testified that she had known Costello since he was ten years old. She saw him on July 9, about twelve o'clock, going past her home at 5656 South Wells street, north toward Costello's home, at 5620. She had been sitting on the porch with her landlord, her two sons and her nephew for about three-quarters of an hour, but at the time Costello passed the others had gone in and she was sitting there alone. Costello spoke to her and raised his hat. Costello's father, a furniture salesman, testified that he got home on July 9 between 10:15 and 10:20 o'clock in the evening. He sat down and had some coffee and then went to bed. He heard Raymond come in around twelve o'clock. Mrs. Nellie Costello, Raymond's mother, testified that on the evening of July 9 Raymond came home to supper about a quarter to seven o'clock; that he went out about a quarter to eight o'clock and she saw him again

somewhere around after eleven o'clock; that her husband
and son were there. She went to bed on that night around
eleven o'clock.

Costello testified that he is twenty-two years old; that
he was in the Pontiac reformatory for boys for stealing
an automobile. He was employed as a fireman on the
New York Central, starting to work in 1920 and worked
for about fifteen months, when he was laid off eight months
and then went back to work and worked steadily until he
was sent to Pontiac. He went to the eighth grade in
school and finished when he was fourteen. His last work
before his arrest was driving a truck. On July 8, about
eight o'clock, he met Eugene Scanlon and Edward Breen,
and they rented a car and took a car ride until about 10:30
or 11:00 o'clock, when Breen said to go over to Madeline
White's house. Costello had never met the girls before
that. They went there, got out and talked to Madeline on
the front porch. Breen introduced him to Madeline as a
police officer named McCarthy. There was no one with
Madeline, and on leaving she gave Costello her telephone
number and told him to call her. The next day, after five
o'clock, he talked to Madeline over the telephone. She
asked who he was,—if he was the fellow that was up there
the night before. He said yes, and she wanted him to
come over to the house. He said he couldn't go. About
six o'clock he was standing on the corner of Fifty-seventh
and Wentworth talking with Breen and another when Andy
Brick came along. He had just returned from Pontiac that
day. Costello went home to supper and remained there
about three-quarters of an hour and then left at twenty
minutes to eight o'clock and went to the playgrounds at
Fifty-seventh street and Princeton, where he again met
Brick. They left the playgrounds and went to Fifty-ninth
and Wentworth. Brick wanted to get something to eat,
and Costello went into a restaurant with him to get a cup
of coffee while he ate. They then went to the drug store

on the corner and Costello called up Madeline and told her he wanted to see her that night. She wanted him to go over to her house and he went over to meet her. Brick went with him. They met her on LaSalle street, between Sixtieth and her house. Her sister, Genevieve, was with her. Costello asked Genevieve if she had anything to drink, and she said no. Costello said something about there being a warrant for them at Englewood. He asked if he could go into the house, and she said no. Madeline was standing there talking to Brick. A machine went by and Genevieve said she had a date with some of the fellows in the machine. She then went towards Sixty-first street. This was about 9:15 or 9:30. Brick, Madeline and Costello stood and talked for a few minutes, and Costello then asked Madeline to walk towards Sixtieth, and the three went to the corner of Sixtieth and LaSalle and stood there a couple of minutes, when Brick said he was going home. He went west on Sixtieth street and Madeline and Costello went east on Sixtieth to Washington Park. They stood talking for awhile and then moved over to a bench. They were sitting there a little while when an officer came along and told them it was eleven o'clock; he was sorry, but they would have to leave the park. They left the park and walked back to Fifty-ninth and LaSalle streets. They stood on the corner awhile and then a fellow whom Costello knew by the name of Mull came along. Mull asked Madeline where she was when he called her up and nobody answered. They stood there talking. It was about 11:30. It was not the Mulholland who testified here. Costello knew him. Then Gallagher came along and spoke to Costello, and Costello told him to wait a minute and he would be right with him. So Costello said good-night to Madeline and walked with Gallagher to Fifty-ninth and Wentworth. Mull remained with Madeline. Gallagher and Costello walked a block and Gallagher took a car south and Costello walked north to his home. On the way he saw

Mrs. Cronin and spoke to her. Her home was not quite a block from Costello's. He entered his home at twelve, or a little before, and went to bed. He was awakened about 8:30 the following morning by his father, Barry and another police officer. He asked what they wanted with him, and they said, "The captain wants to talk with you." They took him to the Englewood police station. They took him up-stairs to a small room on the second floor. They went in with him and Captain Lee and other police officers came in there. Barry asked him where he was the night before. He told him he was with Madeline and Genevieve White and Andy Brick. They asked him where Brick lived, and he told them he didn't know the number but could show them the house. He showed them where Brick lived. Brick was not at home. They brought him back to the Englewood police station to the room on the second floor, where he stayed for about half an hour, when Barry, Lee and a couple of others came into the room. During all this time Costello did not know what they had him there for. They did not say. They asked him where he was the night before. He told them he was with Madeline and Genevieve White and that they stood there for awhile talking and after a while Genevieve left, and he and Madeline went to Washington Park and were sitting on a bench in the park when an officer told them it was eleven o'clock. They left the park and went back to Fifty-ninth and LaSalle, where he met Mulholland, and they wanted to know who Mulholland was. Costello told them all he knew was that he was a man by the name of Mull. They wanted to know where he lived, and Costello told them he did not know. They wanted to know where they could find him, and he told them the only place he knew was around the neighborhood. They asked him the names of the places in the neighborhood, and he told them Fifty-eighth and Wentworth, Fifty-ninth and Wentworth, Fifty-ninth and State. They asked him what happened that night,

and he said they stood there talking a couple of minutes, and Gallagher came along and Costello went over to Wentworth with him. There was more conversation after Lee brought in the handkerchief. Lee asked him if he had seen that blue handkerchief, and he told him no. He took the handkerchief in his hands and just looked at it. A handkerchief was shown him, which he said was like the handkerchief that Lee showed him. He could not swear whether it was the same one or not. He never owned that handkerchief. He heard Brick testify, and he had some blue handkerchiefs, but he did not remember whether he had a blue handkerchief the night he met Brick. After the conversation about the handkerchief Lee walked out of the room with another man. Costello's testimony continues:

"When he walked out, Sergeant Barry says, 'Ain't that your handkerchief?' I says no. He said something about me killing a girl, and I said no, and he said, 'Stand up against the wall.' I stood up against the wall and the man that came to my house with Barry and arrested me hit me with his fists. The man named Owen Ward that is not here hit me right in the stomach, and I bent over to cover myself up so he couldn't hit me. Then Mr. Barry shoved me on the head and I went back in the corner. Then when I came back from the corner, somebody, I don't know who it was, kicked me in the side. Then they started to question me. Mr. Barry says, 'That is your handkerchief,' and then they all began to run at me again. I don't know how many were there—anywhere from eight to ten. They were all police officers. I said the handkerchief ain't mine. Then they started hitting me on the side and head,—Sergeant Barry, Owen Ward and a couple more. I couldn't say how many. They were standing behind me. They were hitting me from behind—on the back of the head. During the time they were hitting and striking me they used pretty rotten language. They would question me and then quit a couple of minutes and then say, 'Did you do it?' and I

would say no, and they would say, 'Yes you did, you dirty
— — — —.' Barry said that for one and Owen Ward
for another. Owen Ward called me worse than that. * * *
Then they wouldn't say anything for five or ten minutes
and then they would start all over again. Some of them
were sitting and some of them were standing. Mr. Barry
was sitting right in front of me. Next Mr. Lee came in,
and he excluded Mr. Starr and several more, and he only
left Mr. Barry, and I believe the name was McCune,—the
man that testified in a gray suit yesterday. And then there
were two more, if I am not mistaken. He says, 'Isn't it
the truth that you and Mulholland killed that girl?' I says
no. He says, 'Wasn't you present when she was killed?'
and I says no. Then he walked out in the hall and came
back and started telling me where the crime was at. He
said that Mulholland and I were standing on the corner,
and asked me if that was not right. I said yes. He said,
"That Mulholland—did Mulholland ask you any question
whether or not you had intercourse with Madeline White?'
I says, 'Not that I remember.' He said, 'Did not he ask
you if you had intercourse with her?' I says no. And he
says, 'Didn't you say—suggest that you take a walk south
on LaSalle?' and I says no. He asked me if we didn't
walk down to 5931 and sit on the steps, and I told him
we didn't,—that is, as far as me, I didn't. Then he says,
'Didn't Mulholland grab the girl and drag her into the
gangway?' I said no. And he kept asking me questions,
whether I killed her or not, and I said no; and whether
Mulholland killed her or not, and I said no. 'Ain't it a
fact,' he says, 'that Mulholland dragged her underneath or
in the gangway and you helped put her under the porch?'
and I says no. After that I don't remember much what
happened because I was pushed about quite a bit. Some-
body said, 'Throw him out of the window.' I was fright-
ened and scared. Mr. Barry and the fat man,—I don't
know what his name is,—said the best ·thing they could

320—7

do was to take me down in the basement and beat my god damn head off. Then Captain Lee came back and called Mr. Barry out of the room. Then Mr. Romano came in."

Costello then continued his testimony, giving his version of the conversation with Romano, and saying that after he finished Romano made a typewritten statement, which he handed to Costello and asked him if he wanted to sign it, but Costello laid it down on the desk and said no. Costello then repeated substantially the statements he had made in the presence of the court and out of the hearing of the jury during Romano's examination, saying that he said he had nothing to do with the killing of any girl and he refused to sign the statement. After that they took him to the morgue, at Fifty-eighth and Wentworth. Captain Lee and Romano went with him. When they got there Lee took him back in a dark room where Madeline's body was. They turned on the lights and Lee asked if that was the girl he left with Mulholland, and he said yes. Lee asked if Costello knew anything about the killing, and he said no. They then went over to LaSalle, between Fifty-ninth and Sixtieth. There were some people in front of the house and there was some trouble in getting in where they wanted. After they did get there Romano suggested going to the State's attorney's office and waiting until a later hour and going back to the scene of the crime, he called it. Costello was not sure of the number. It was not Madeline's home. It was between Fifty-ninth and Sixtieth. After that he was taken over to the north side,—to the State's attorney's office, which he did not leave until nearly one o'clock in the morning. It was about eight o'clock when they got there. He was questioned by Gorman, McMillan, Romano, McSwiggin and the police officers. He had had nothing to eat since the night before. He asked for something to eat in the police station but did not get it. He asked Lee, and he said he would get him something to eat, but he never got it. The next morning he asked

Gorman for something to eat, and he got it. He was arrested Friday morning. He asked Barry for water, and Barry said all right, but he did not get it. He did not remember the questions and answers there. This was the same day after he was beat up at Englewood. After he left the State's attorney's office, Gorman, Lee and detectives in two squad cars took him to the undertaker's, a little after one o'clock in the morning. He was taken into the same room he had been in the day before, where Madeline's body was. Gorman pointed to the marks on the girl's face and neck and asked Costello if he saw them, and he said yes. Gorman told him to view the marks,—to go over and touch them,—and he did. They then took him to a house between Fifty-ninth and Sixtieth streets, on LaSalle. Gorman and Lee took him to the porch and pointed underneath it and started talking about the dirt, saying it looked like a struggle or something. Gorman asked if that was where he put the body, but Costello did not answer him. He did not answer the questions and there was nothing more said to him. There were other people around. They then put him back in the car and took him to Englewood. He got there about two o'clock. They took him to an office on the first floor and Gorman and Lee came in with him, and there were three or four other police officers there already. Costello asked to see Gorman alone. He asked Gorman if he would have the police officers so they would not hit him any more, and he said he would, and he called Lee in the office and gave Lee instructions that he was not to be touched further. After that they took him to the station at Seventy-fifth and Maryland streets, about 2:30 or 3:00 o'clock Saturday morning, where they put him in a cell. He asked McEwen to get him something to eat, and he said he would, but he did not. It was about seven or eight hours before he got anything to eat. He lay down on the bed in the cell, and about fifteen minutes afterward a police officer in uniform and two men in civilian

clothes came in, woke him up and made him go up to the bars, and the man in uniform said, "Is this the man?" and the two men said, "Yes; that is him," and they then went out. The next morning Costello was taken over to Gorman, who asked him if he wanted to make a statement, and he made another statement to Gorman in regard to his actions on the night of July 9.

In rebuttal Barry testified that he saw no one at any time strike or beat Costello in any way and never saw him kicked by an officer; that he never struck Costello with his hand, either open or closed, and did not see Sergeant Ward strike him; that Costello had food, as Mrs. Patterson went out and got food for him at the Englewood station,—sandwiches and coffee,—and brought them in to him, and on the way down to the State's attorney's office, and at the office, he had something to eat; that Barry was in Costello's presence, on and off, from the time he arrested him at 8:30 on July 10 until about 1:00 o'clock the following morning; that no one shoved or pushed Costello in Barry's presence, and he did not hear any profane language used to Costello. Sergeant McShane testified that he conducted part of the investigation into the death of Madeline White, and that no one struck, hit, beat or kicked Costello while McShane was in the room, and he did not hear any profane language used or any names called; that Costello was given food at the Englewood police station and ate it on the way to the State's attorney's office, sitting alongside of McShane and Costello's wife in the Cadillac squad car; that McShane was in the room, off and on, in the presence of Costello during the time officers Barry and Ward were there, and was there about the same kind of hours that Barry put in; that he left the Englewood station about 2:30 in the morning; that he could not say how many times he left the room; that no one struck Costello while he was in the room, or kicked him, or called him profane names; that he was not shoved around while Mc-

Shane was there; that McShane was there pretty near all the time; that there were five or six officers in the room, including the captain; that he was not pushed or shoved or kicked or anything; that he was treated like a prisoner ought to be treated.

Michael Lee testified that on July 10, in the Englewood police station, at no time did he see Costello struck, hit or beaten. He was out of the presence of Costello on several occasions but couldn't say definitely how many. As far as he knows he was in Costello's presence all the time except about one-half hour, when Costello was up-stairs and Lee was down-stairs. After he made his confession Lee took him down-stairs and then sent him back when Romano came. Lee did not see him shoved or pushed and did not hear anybody curse him.

Dr. Ralph B. Cobb testified that on July 11, at twenty minutes to one o'clock, he went to the State's attorney's office and examined Costello, who complained that he had been kicked in the left chest and in the belly on the afternoon of the day before. Costello was stripped and the doctor made a thorough examination of his entire body for bruises and marks and found none, though Costello has a fair skin, of a kind that shows bruises easily.

Romano testified that on July 10, in the conversation with Costello in the Englewood police station, he asked Costello if he had been hit, beaten, struck or abused in any way and how he had been treated by the officers since he had been taken into custody, and he said he had been treated fairly and decently and had not been abused or threatened in any way. Romano told him that no one in that room had the power to come to the north side and recommend a lighter sentence for him than would be imposed by a jury; that no promise could be made to him of immunity; that under the law he had a right to remain silent if he saw fit; that any statements he might make to Romano might be used against him in any court proceedings

that might arise; that the statement would be the property of the State's attorney and the police officers, to do with as they saw fit in any court proceedings.

Aside from Costello's statements to Barry, Lee and Romano the evidence of his guilt was wholly circumstantial. The incriminating circumstances were that he called Madeline on the telephone, impersonating a police officer, for the purpose of making an appointment with her to meet him and told her it would be for her interest to see him. He met her on the street at night and invited her to walk with him and went to the park alone with her and there tried to induce her to have sexual intercourse with him. He was the last person seen with her before her death, and within two or three hours after he was seen with her last, and within a block of the place, she was ravished and killed by strangulation with a handkerchief similar to the handkerchief he was carrying. These circumstances, while good reason for violent suspicion, might not have convinced the jury, beyond a reasonable doubt, that he was the perpetrator of the crime, but when to them was added his narrative of the actual commission of the crime no doubt of his guilt could longer remain. The question of the competency of these statements is therefore of vital importance in the consideration of the case.

No objection whatever was made to Barry's testimony as to Costello's statements. Michael Romano was the next witness. After the State's attorney had examined him a few minutes about his conversation with Costello an examination occurred in chambers, and at the request of his attorney Costello was examined. His testimony at that time has been stated, and it contains no mention of any ill-treatment by the police. At the conclusion of Romano's testimony the court, at twenty minutes after twelve o'clock, took a recess until two o'clock in the afternoon of the same day. In the afternoon Captain Lee was called and asked to tell what was said by Costello and himself in the con-

versation at the Englewood police station on July 10. Then for the first time in the trial was any mention made of duress when Costello's attorney stated that he wanted to object to any statement or admission that was obtained by duress and by promises. Thereupon Costello was again examined in chambers, out of the presence of the jury, and his testimony at that time has also been stated. When he stated that he was shoved in a corner and hit constantly on the head the court asked him why he had not said something about that when he was testifying before, and he said, "Well, they didn't hit me while Mr. Romano `was there." The court asked him why he did not tell his counsel when he was cross-examining Barry in the morning, and he answered that he did not have a chance to tell his counsel while Barry was on the stand in the morning. He said that he had talked to his counsel once about the case and at that time told him that he had not made any confession or admission. He told him that he was hit but did not say how many times, because he did not know himself. He did not know the name of the man who struck him and did not tell Romano that he was not struck. Of course, if his testimony in regard to his treatment by the police is true his admissions or confessions obtained by such treatment were not admissible in evidence, but the court was not bound to accept his testimony as true or to regard the testimony of the police as false.

An admission or confession of a defendant to which no objection is made is properly admitted in evidence without the introduction of any preliminary proof. If objection is made, it is the duty of the court to hear, out of the presence of the jury, such evidence as either side may present as to the circumstances under which the confession was made, with a view to determining whether it was voluntarily made or was procured by the pressure of hope or fear applied for the purpose of producing it. The motive of the defendant does not affect the competency of his

confession if it was made voluntarily, but the means used to obtain it will be examined to determine whether it was voluntary. There is no rigid rule as to the order of proof. This preliminary question must be decided by the court upon the evidence heard, and its decision will not be reversed unless manifestly against the weight of the evidence.

Barry's testimony as to the statements made to him by Costello not having been objected to was properly admitted in evidence. During Romano's testimony Costello's attorney stated that he would like to ask Costello a question, and he examined him, but Costello said not a word about any ill-treatment or physical or mental abuse or torture. It was the duty of the court to decide in the first place, from the evidence, whether the admissions were competent, and the law did not require that he should be convinced, beyond a reasonable doubt, of the voluntary character of the admissions. While he may not disregard evidence of the defendant or in his behalf that the confession was forced from him by torture or physical violence, (*People* v. *Sweeney*, 304 Ill. 502,) his decision on this question will not be reversed except where there has been an abuse of discretion. (*People* v. *Fox*, 319 Ill. 606; *Hopt* v. *Utah*, 110 U. S. 572.) Though there may be evidence of threats or promises made to influence the making of the confession, if there is sufficient in the facts and circumstances proved to show that the confession was voluntarily made there can be no abuse of judicial discretion in allowing it to be proved to the jury. (*Bartley* v. *People*, 156 Ill. 234.) The objection to Romano's testimony was therefore properly overruled.

When Lee was asked about Costello's statements the question of duress was first mentioned, and Costello for the first time narrated the physical violence and the abuse to which he testified he was subjected. When the court asked him why he did not say something about that when he was on the stand before, his answer was that he had no chance while Barry was on the stand; that he had talked

to his counsel once about the case and had told him that he did not make any confession or admission. After Romano's testimony closed there had been a recess of an hour and a half, affording an opportunity for a conference between Costello and his counsel, at which the latter might learn more definitely from Costello what he claimed the facts were. It may be inferred from Costello's statements as testified to by the People's witnesses and his refusal to sign any written statement that he supposed a confession must be a signed statement, and that by refusing to make any written statement he could "cop a plea," which he explained by saying that there were many who came to the north side who were able to plead guilty and get off lightly. At all events, when Lee was called objection was made to his testifying to Costello's statements, and Costello took the witness stand to testify to the physical violence exercised upon him by the officers in the room where he was questioned. Lee testified that no one put a hand on him while he was there. Another officer was asked by the court if he was there, and he said he was all the time, and said that he did not hit or punch Costello or see Ward or Barry or anybody else lay a hand on him; that he was there all the time, except when he went to the toilet or to get a sandwich. Costello testified that Gorman, who was first assistant State's attorney, gave orders to Lee at Englewood station that Costello was not to be hit, but this was not until early the next morning, hours after the statement was made, and it was not evidence that Costello had been hit by anyone. The objection to Lee's testimony was properly overruled.

Costello denies that any confession was made. He denies every statement put in his mouth by the People's witnesses after he, with Madeline, met Mulholland (or Mull) at the corner of Fifty-ninth and LaSalle streets. It is scarcely credible that Barry, Lee and Romano created the story of the action of this crime, with all its details, out

of whole cloth. They are corroborated by the four witnesses who testify to Costello's visit, with the officers, to the scene of the crime on the afternoon of July 10 and to his statement that there was where he put the body under the porch. His confession shows him as a participant in the crime and guilty as an accessory, but if his account of Mulholland's connection with the crime is untrue and was devised to mitigate, if possible, the degree of his own guilt the jury properly rendered the verdict of guilty. It was their province to determine the credibility of all the witnesses, including those whose testimony tended to prove an alibi, to accept such part as they believed to be true and reject such part as in connection with all the evidence in the case they believed to be false, and to render their verdict according to the weight of the evidence.

The plaintiff in error contends that the court erred in giving the People's ninth, twelfth and nineteenth instructions and in refusing to give the defendant's sixth, fifteenth, seventeenth and nineteenth instructions.

The People's ninth instruction was on the subject of reasonable doubt and concluded with the statement: "The reasonable doubt that the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case not necessary to constitute the crime charged." It has often been said that the reasonable doubt which the jury may entertain must be as to the whole evidence and not as to any particular fact, but it has been held that the announcement of this principle in the language just quoted ought not to be made without in some way definitely informing the jury what are the essential material facts constituting the crime with which the defendant is charged. (*People* v. *Cramer,* 298 Ill. 509; *People* v. *Seff,* 296 id. 120; *People* v. *Johnson,* 317 id. 430.) In *People* v. *Cramer, supra,* it was said: "Whether such an instruction would be ground for reversal might depend upon the

state of the record, which might or might not raise an inference that the jury had been mistaken in their view of the law as to what was material." The jury could not have been misled by this instruction in view of the evidence in the case and the conclusive proof of the defendant's guilt.

Instruction No. 12 was on the subject of the credibility of the witnesses and the duty of the jury in judging their credibility. After enumerating some circumstances to be considered by the jury on this question the instruction concluded: "and any circumstances in evidence that tend to shed light upon his credibility. You should determine the amount of credence herein to which each statement is entitled at your hands as reasonable and intelligent men." *People* v. *Krauser,* 315 Ill. 485, is cited in support of this objection, and the language used in that opinion in discussing a similar instruction is quoted, as follows (p. 518): "It told them that without any reference to the evidence in the case or what occurred during the trial they were at liberty to determine the credibility of the witnesses according to their own judgment, without any guidance from the court as to the reasons which might be proper to consider in determining the credibility of witnesses." The instruction considered in the *Krauser case* was materially different from the one under consideration here, since the concluding sentences in the instruction considered there omitted the reference to the words "in evidence" and "from the evidence," which are contained in instruction 12.

The objection made to instruction No. 19, which was on the subject of an alibi, is that the defendant did not attempt to prove an alibi as a part of his defense, and it was prejudicial to instruct the jury as if that were a question in the case. At the trial the court gave to the jury, at the request of the defendant, an instruction on the subject of an alibi, and he cannot, therefore, complain that an instruction was given at the request of the People on the

same subject. The testimony of Gallagher, Costello, his father and mother and Mrs. Cronin as to the time of his leaving Madeline and Mulholland, passing Mrs. Cronin's house and arriving home, was on the question of an alibi, and the instruction was properly given.

The defendant's refused instruction No. 6 informed the jury at some length and with some argument that they had no right to disregard the testimony of a witness simply because such witness testified on behalf of the defendant. It was properly refused because it applied only to the witnesses for the defendant. The rules in regard to the credibility of all witnesses are the same, no matter on which side they testify, and it is improper to give a general instruction calling attention to the witnesses of one of the parties, emphasizing the fact that the jury have no right to disregard the testimony of such witnesses.

Refused instructions Nos. 15 and 17 were on the subject of circumstantial evidence, and the plaintiff in error insists that the jury were not fully instructed as to the law of circumstantial evidence, and it was therefore error to refuse these instructions. Instruction No. 15 begins with the statement that "all the evidence produced by the State is circumstantial. There is no direct or positive evidence that the defendant committed the crime charged." The statement is not correct and the instruction therefore would be misleading. The confession of the defendant was direct and positive evidence that he committed the crime. Refused instruction No. 17 is in reference to a case of circumstantial evidence, and for this reason it, also, was misleading and properly refused.

Instruction No. 19 was to inform the jury of the rule under which a confession could not be received in evidence. As that was a question for the court and not the jury to decide, and the court had already decided it, the instruction was properly refused.

Some objections to evidence are urged in argument for the plaintiff in error. Evidence was introduced about a telephone conversation between Costello and Madeline which was objected to because the evidence did not identify Costello. Subsequently he testified to this telephone conversation himself, so the ruling of the court became immaterial.

Objection was made to the testimony of the coroner's chemist who made a chemical examination of some of Madeline's organs, and it is argued they were not properly identified as having been received from Dr. Springer. In view of the other evidence, as well as Costello's confession, the evidence later became immaterial.

A record writer in the office of the clerk of the criminal court was asked, "Have you the proper records with which to prove the criminal record of Raymond Costello?" An objection was made to the criminal court record of Costello unless Costello was referred to by an officer who was familiar with the case,—familiar enough to identify the defendant, Costello, as the same Costello referred to,— and the objection was overruled to the question. On cross-examination the witness was asked, "Do you know the Raymond Costello that is referred to as the defendant in the record?" and an objection to the question was sustained. Thereupon Fred C. Amstein, a police officer, was called, who testified that in 1922 he handled the case of Raymond Costello, and was in Judge Sullivan's court on April 19, 1923, and saw Costello in court at that time but could not say as to the date of the conviction. A motion was made to exclude Amstein's evidence on the ground that "it is not connected properly by the officer,—nothing to set forth definitely the time corresponding with the record." This motion was overruled. It is argued that it was prejudicial to the rights of the defendant for the clerk from the clerk's office of the criminal court to testify about a record of a conviction of Raymond Costello without offering the record in evidence, and for a police officer to testify about certain

convictions without connecting them up with the record properly in evidence. The testimony of the clerk would have been incompetent in regard to the criminal record if it had been objected to on the ground that the record could not be shown by parol, but it was not objected to for that reason. Counsel said that he was going to make an objection to the criminal court record of Costello unless Costello was referred to by an officer who was familiar with the case,—familiar enough to identify the defendant, Costello, as the Costello referred to. The record writer did not identify him but he was identified by Amstein, and there was no prejudice to the defendant.

Other objections of minor importance have been made, but they are not of such a nature as to show prejudice to the defendant or require separate discussion.

It is contended that the conduct of William H. Mc-Swiggin, the assistant State's attorney who tried the case, was prejudicial. His conduct was aggressive, overbearing, browbeating and hectoring, and his language was frequently offensive, insolent and insulting to counsel for the defense, and the proceedings would have been more in accordance with the dignity of the court and the proper standard of professional conduct if the court had restrained the violence of his language, but the record does not show any rulings of the court which we regard as prejudicial to the plaintiff in error.

The judgment will be affirmed and the period between nine o'clock A. M. and five o'clock P. M. of the sixteenth day of April, 1926, is fixed as the time when the original sentence of death entered by the criminal court shall be executed.                    *Judgment affirmed.*