(No. 15794.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES CALSEG *et al.* Plaintiffs in Error.

*Opinion filed February 19, 1924—Rehearing denied April 3, 1924.*

1. CRIMINAL LAW—*when the refusal to admit proper evidence is not ground for reversal.* Defendants charged with robbery, which took place about ten o'clock at night, should be allowed to prove by their landlady that she heard some people in their room about 9:30 or 10:00 o'clock that night and heard shoes dropped on the floor according to the habit of one of the defendants; but the error in refusing to admit such testimony will not warrant a reversal where it is apparent from the evidence in the record, including the contradictory stories of the defendants, that it could not in any way have influenced the verdict.

2. SAME—*jury cannot determine competency of a confession—instruction.* The jury have a right to consider the circumstances under which a confession is made, with the fact that it is corroborated or contradicted by other competent evidence in the record, for the purpose of determining the credit to be given it, but it is not their province to determine its competency, and an instruction authorizing the jury to disregard confessions admitted in evidence if they find that they were involuntary is properly refused.

3. SAME—*argumentative instruction as to the value of certain method of identification is properly refused.* The court may refuse an instruction stating that an identification of one accused of crime when brought in alone before the prosecuting witness, who knows that such person is being brought in for the purpose of identification, has not the same weight as where the witness picks out the accused from a number of unknown persons, as such instruction does not state a proposition of law but is merely argumentative.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE KERSTEN, Judge, presiding.

CANTWELL & CANTWELL, (ROBERT E. CANTWELL, JR., and THOMAS E. SWANSON, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

William Turk, (alias Jacob Gold,) Edward Eisenstadt, (alias Edward Stad,) and plaintiffs in error, James Calseg and John Murphy, were indicted in Cook county for robbery with a gun. Turk was granted a separate trial. The other three were convicted as charged. Eisenstadt was granted a new trial and plaintiffs in error were sentenced to the penitentiary. They prosecute this writ of error to reverse the judgments of conviction.

Dorothy Davies testified that she lived with her husband at 3043 Warren avenue, in Chicago; that Friday evening, October 13, 1922, she left her house about ten o'clock to go to her husband's office; that her automobile was standing in front of her house; that she had just stepped into the automobile when two young men approached and leveled guns at her; that they said, "Don't scream or we will kill you; get those stones off and get them off quick;" that she was wearing a bar pin, two rings and a wrist watch, all set with diamonds; that there was an arc light burning in front of her home; that she could see the two men well; that she talked with them and observed them while she was removing her jewelry; that they were well-dressed young men, both dark complexioned, one slightly smaller than the other; that plaintiffs in error are the two men who robbed her; that she saw them at detective headquarters two days after she was robbed and identified them immediately; that

she saw at headquarters, at the same time, a man whom she knew as Edward Stad; that she had seen him on two previous occasions; that he rode with her and her husband to the fair grounds at Aurora in September; that she wore her diamonds on that trip; that she saw him a second time about the first of October at her husband's place of business; that she talked to him at headquarters about his possession of her bar pin, which the police had found when he was arrested; that at first he denied any knowledge of the robbery and claimed that he had bought the pin; that later he admitted helping Turk dispose of some of her jewelry. She identified as her property jewelry which was recovered by the officers.

Hugh T. McCarthy, a detective sergeant, testified that he arrested Eisenstadt about four o'clock Sunday morning, October 15, as he was driving into a public garage; that he accompanied him to his room in an apartment at 3833 Grand avenue; that in the drawer of a dresser in Eisenstadt's room he found some platinum jewelry from which the sets had been removed and in his pocket he found a platinum brooch; that he found a loaded revolver in Eisenstadt's room and another hidden behind the garbage can on the back porch; that while he was searching the place, the plaintiffs in error, Calseg and Murphy, came to Eisenstadt's room and that he placed them under arrest; that they stated that they were there to buy some wine; that in Eisenstadt's pocket he found a slip of paper on which were written the words, "Warren, Albany, first light post on south side of street;" that he called the patrol wagon and took the prisoners away; that he talked to Eisenstadt at detective headquarters about five o'clock Sunday evening; that he called Mr. and Mrs. Davies and they came to headquarters; that Mrs. Davies identified the platinum piece which had been taken from Eisenstadt's pocket; that at first he claimed that he had bought it and knew nothing about the robbery; that later he told them that one Moe, who operated a poker game

.at the Tremont Hotel, had her diamonds; that Moe drove a Haynes car with no license plates and that he left it standing in front of the hotel; that Eisenstadt was taken to the hotel, where he pointed out the automobile; that officers were left there and Moe was arrested when he started to drive the car away; that Moe is Turk; that about the time Turk was brought to headquarters, plaintiffs in error, Calseg and Murphy, were brought before Mrs. Davies, who immediately said, "Those are the two men who robbed me;" that he told her to study them and be sure that she was right; that he told them to take off their hats and to turn around; that they did so, and Mrs. Davies said, "Those are the men;" that he then inquired of Eisenstadt what guns were used in the hold-up; that Eisenstadt told him that the one found in his room and the one hidden on the back porch were used; that an automatic revolver was found on the back porch, but Eisenstadt said it was not used in this hold-up; that Turk was searched when he was brought to the station and four diamond rings were found on his person; that Calseg and Murphy overheard him say to an officer that he had found the rings on Turk; that Murphy said, "Those Jews are not going to tell on us; we will tell it all now and you will get back the rest of the property;" that the four prisoners were taken into one room; that Eisenstadt was asked if he knew Turk, and answered that he did and that he was the man he knew as Moe, who drove the Haynes car.. In response to questions by McCarthy, Eisenstadt stated, in the presence of plaintiffs in error, that the four of them met at the Tremont Hotel. the night of the robbery; that Calseg rode with him and Murphy rode with Turk; that they drove to the Davies place and that he pointed out to them the Davies house and automobile; that he left Calseg and Murphy with Turk to watch the automobile and that he drove away, agreeing to meet. them after· the robbery; that he waited at the designated point .nearly two hours; that when they met, Calseg

entered his car and they drove to his house; that Turk and Murphy followed shortly; that they met in the kitchen of his apartment and punched the diamonds out of Mrs. Davies' pin; that the large diamonds were re-set in rings and the small diamonds were sold to a diamond merchant. McCarthy testified further that at this conference Calseg said that he rode from the Tremont Hotel to the scene of the robbery in Eisenstadt's car; that Murphy stated that he rode from the hotel to the scene of the robbery in Turk's car; that Calseg said he went with Eisenstadt to the jeweler's, where the large diamonds were re-set and the small ones sold; that Murphy stated that the rings and watch were in a pawnshop across the street from the St. Regis Hotel; that the officers went to the two places indicated and found Mrs. Davies' property there; that all these statements were made by the accused freely and voluntarily and that they were not in any manner abused while in his custody.

William Turk testified that he assumed the name of Jacob Gold to conceal his identity; that he was in the Tremont Hotel Friday evening, October 13; that Murphy came to his room about 7:15 P. M. and told him to come downstairs because he had something doing; that he went down and got into his car; that just as he started the motor Eisenstadt came up and said to Murphy, "Let him follow my car;" that he waited a minute until a Ford touring car drove by; that Murphy said, "There he goes;" that he followed; that they stopped on the north side of Warren avenue, about 75 feet east of Albany; that Eisenstadt had a short conversation with Murphy and then drove away; that they waited about two hours, watching a Jordan closed car which stood on the south side of Warren avenue about 300 feet east of them; that about 10:00 P. M. a woman came out and Murphy and Calseg went over to her car; that they were gone four or five minutes, then came back and said, "Let's go;" that they drove to Kedzie and Lake, where they met Eisenstadt; that Calseg stepped out of wit-

311-24

ness' car, taking the pistols and jewelry with him, and got into Eisenstadt's car; that witness drove his car to the LaSalle garage and then he and Murphy drove in a taxicab to Eisenstadt's home; that the four of them broke up the brooch and took out the stones; that they met the next day about noon; that Eisenstadt and Calseg took the stones that had been taken from the brooch and went to dispose of them; that he and Murphy took the rings and the wrist watch and disposed of them to the pawnbroker for $1200; that he and Murphy then drove to Milwaukee avenue and Paulina street, where they found Eisenstadt and Calseg; that they had had four of the large stones set and had sold one large stone and all the smaller ones to the jeweler who had set the stones; that the proceeds of the sale were divided among them; that Eisenstadt gave him the four rings and asked him to dispose of them; that he was arrested about 11:30 Sunday night and the rings were found in his possession; that he was taken into the room where his accomplices were; that Eisenstadt, in response to a question, said that witness was the man known to him as Moe, who drove the Haynes car; that Murphy said that witness was the man who drove the car in which he went to the scene of the robbery; that Calscg said witness was the man to whom the diamond rings were given; that he accompanied the officers to the pawnshop, where the rings and the wrist watch were recovered; that he had been convicted of the crime of forgery at St. Joe, Missouri, and that he had served time in the Missouri penitentiary.

John Murphy testified that prior to his arrest he roomed at 3328 South Michigan avenue; that Calseg roomed with him; that at the time of his arrest he was employed as a cigar clerk by Meyer Lintz, at 3417 West Roosevelt road; that he worked from 6:00 P. M. until 3:00 A. M. every night; that he had never seen Eisenstadt prior to the time of his arrest; that he had seen Turk at the store once but was not acquainted with him; that he had nothing to

do with the robbery of Mrs. Davies; that when he quit work Sunday morning he and Calseg went to the Erie cafe, arriving there about 3:30 A. M.; that he met a woman there who told them that they could get some wine at Stad's apartment; that they went to the address given, rang the doorbell and asked the landlady for Mrs. Stad; that she directed them to apartment 3; that they went there and knocked at the door; that they found Stad and a woman and the police officers there; that they were placed under arrest; that sergeant McCarthy asked him what he was doing there, and that he answered that he came for some wine; that McCarthy took him into the vestibule and beat him with a blackjack over the body, head and legs; that he was taken to the detective bureau; that he and Calseg were brought before Mrs. Davies, and McCarthy said to her, "Did you ever see these boys before?" that she hesitated a moment and McCarthy said to her, "You know these boys?" and she then said, "I think I have seen them some place;" that he was turned over to another officer; that Calseg was taken by McCarthy into an adjoining room; that he heard blows and heard Calseg screaming; that when he went into the room he saw Calseg lying on the floor; that sergeant McCarthy beat witness with a blackjack and knocked him down a couple of times; that he picked up a chair and hit him with it and that officer Baynes stopped the sergeant; that he did not admit, in the presence of Calseg, Eisenstadt and Turk, that he participated in the robbery; that he did not say that he was not going to let the Jews frame on him and that he would tell all about the robbery; that he was taken before the court for a preliminary hearing Saturday, October 21; that he did not tell the judge that he had been beaten; that he had no lawyer to represent him and that he waived preliminary examination. On cross-examination he changed his testimony about working on the night of the robbery and testified that the

last night he worked for Lintz was Thursday, October 12; that on Friday night he left his rooming house with Calseg about six o'clock and went to a picture show; that they came back to their room about 9:30 P. M. and played cards a while before they went to bed.

James Calseg testified that he and Murphy roomed together at the home of Mrs. Jennie Clark; that on the morning of his arrest he met Murphy about three o'clock and that they went to the Derby cafe, where they met a girl; that she directed them to an apartment on Grand boulevard where they could get some wine; that he had never seen Stad before that morning; that he was arrested in Stad's apartment and taken immediately to the detective bureau; that no gun or jewelry was found on him; that Mrs. Davies identified him Sunday evening; that about nine o'clock that night sergeant McCarthy came to him and asked him if he had seen the goldfish; that he answered that he had not; that McCarthy said, "You are going to see them now;" that he struck him with his fist and knocked him to the floor; that he dragged him out into the hall, and when witness raised his head McCarthy kicked him in the ribs; that officer Hughes also struck him; that he had no part in the robbery of Mrs. Davies on the night of October 13 and that he did not admit participation in it; that he heard the testimony of Turk and that that testimony was not true; that he and Murphy left their rooming house about five o'clock Friday evening, had lunch and then went to the Rose Theater, where they saw a moving picture; that they left the theater about nine o'clock and went home; that they did not go to bed immediately but played cards until about eleven o'clock; that a man by the name of Spicler came to the detective bureau a few days after his arrest and identified him as one of the men who sold him some diamonds; that while he was in jail he talked to Turk regarding his statement to the police; that he said to Turk, "You know I am innocent; why don't you tell the truth

and put me on the street?" that Turk admitted that witness
was not implicated in the robbery, but said he could not
tell the truth because if he did he would be killed; that
this conversation took place in the presence of another
prisoner, Max Berman. Berman corroborates his statement
while Turk denies that such a conversation took place.

Plaintiffs in error contend that the confessions made by
them at detective headquarters were not free and voluntary
but that they were brought about by force and intimidation.
This contention is somewhat inconsistent with their testi-
mony that the confessions were not made at all. Further-
more, every police officer who had had them in custody and
who was charged with participating in the beatings claimed
to have been administered to them denies that they were in
any way mistreated. No person testifies to anything that
in any way corroborates their unusual stories. The evi-
dence concerning their confessions was properly admitted.

Plaintiffs in error called Mrs. Jennie Clark, from whom
they rented their room, and offered to prove by her that
she heard some people in their room about 9:30 or 10:00
o'clock the night of October 13; that she heard some shoes
dropped on the floor, and that it was the habit of one of
plaintiffs in error to throw his shoes on the floor instead of
setting them down quietly. The court refused to receive
this evidence. It was competent and should have been ad-
mitted. On the other hand, it was of such questionable
value that it could not in any way have influenced the ver-
dict of the jury. On the stand Murphy changed his story
to make it fit the testimony of this witness, and no jury
would have believed his story after he made this change.
Mrs. Clark did not pretend to know who the people were
who made the noise up-stairs that night nor did she fix
definitely the hour when she heard the noise. The error
was harmless.

Plaintiffs in error offered two instructions which told
the jury, in substance, that a confession obtained by duress

was incompetent, and that they should disregard the confessions in this case if they found that they were involuntary. These instructions were properly refused. It is for the court to determine whether a confession is competent evidence. The jury have a right to consider the circumstances under which a confession is made and the fact that it is corroborated or contradicted by other competent evidence in the record, for the purpose of determining the credit to be given it, but it is not their province to determine its competency.

The court refused an instruction which told the jury that "where one under arrest is brought alone before a prosecuting witness for the purpose of identification and the witness knows that the party arrested is to be presented for that purpose, an identification under such circumstances cannot be given the same weight and credibility as where the witness picks out the accused from a number of unknown persons." This instruction does not state a proposition of law. It is sound argument, but it is not the province of the trial judge to make an argument to the jury. The instruction was properly refused.

We have read all the evidence in this record and are convinced that plaintiffs in error are guilty. It is unfortunate that the two arch-conspirators, Turk and Eisenstadt, who planned this robbery and who disposed of the loot through channels familiar to them, have so far escaped punishment which they so well deserve, but that can have no bearing on our consideration of the guilt of their partners in crime. We must trust that the State's attorney will do his duty, to the end that the accomplices of plaintiffs in error, who this record shows are beyond question guilty of robbery with a gun, may be properly punished.

The judgments of conviction are affirmed.

*Judgments affirmed.*