THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* NICHOLAS GUIDO *et al.* Plaintiffs in Error.

*Opinion filed April 23, 1926—Rehearing denied June 4, 1926.*

1. CRIMINAL LAW—*admissibility of confession must be determined by court out of presence of jury.* Where objection is made to the receiving in evidence of admissions or confessions of defendants, it is the duty of the court to hear, out of the presence of the jury, such evidence as either side offers as to the circumstances under which the confessions were made, with a view to determine whether or not they were voluntary.

2. SAME—*confessions, to be admitted in evidence, need not be proved voluntary beyond a reasonable doubt.* In determining the competency of admissions or confessions as a preliminary question the court need not be convinced, beyond a reasonable doubt, of their voluntary character.

3. SAME—*when decision of court admitting confessions will not be reversed.* In determining the competency of confessions as a preliminary question the court cannot disregard evidence of defendants that the confessions were forced from them by torture or physical violence, but where the evidence is contradictory, all the charges of violence being denied, the decision of the court admitting the confessions will not be reversed unless it is manifestly against the weight of the evidence.

4. SAME—*when court does not abuse its discretion in admitting confessions in evidence.* Though there may be evidence of threats or promises made to induce the making of confessions, if there is sufficient in the facts and circumstances proved to show that the confessions were voluntarily made there is no abuse of judicial discretion in allowing them to be presented to the jury.

5. SAME—*when defendant may be convicted by his confession.* Where the *corpus delicti* is proved by evidence independent of the defendant's confession the defendant may be convicted by his confession, even though he claims it was not voluntary and denies the truth of the statements in it.

6. SAME—*intent to kill is not a neecssary element of murder.* Intent to kill does not enter into the definition of murder, and on a trial for murder it is sufficient to prove an unlawful killing with malice aforethought, which means that it is sufficient to prove general malice as distinguished from a specific intent to kill.

7. SAME—*when instruction as to responsibility of accomplices is not improper.* Where two or more persons agree together for the purpose of committing a crime all are responsible for the act of each done in carrying out the common purpose, and an instruction stating such proposition in a murder trial is not erroneous in using the word "conspire" instead of the words "agree together," even though a conspiracy is not charged.

8. SAME—*when instruction directing verdict is not improper as referring to circumstantial evidence, alone.* An instruction that a verdict of guilty is authorized if the facts and circumstances shown by the evidence are sufficient to satisfy the jury of the guilt of the defendants beyond a reasonable doubt, is not to be regarded as referring to circumstantial evidence, as the facts and circumstances in evidence include all the evidence in the case.

9. SAME—*the jury may accept or reject any part of confession.* While a statement against interest must be introduced in its entirety, it does not follow that a confession must be accepted by the jury as true or disregarded as false in its entirety, but the jury have a right to consider the confession with all the other evidence in the case tending to support or contradict it and give credence to any part found to be true or reject any part found to be false.

10. SAME—*jury cannot entirely disregard confessions admitted in evidence—instructions.* While the jury may determine whether a confession is true or false or partly true and partly false they can not entirely disregard a confession admitted in evidence, and instructions to the effect that it is the duty of the jury to disregard confessions unless they are satisfied, beyond a reasonable doubt, that they were made freely and voluntarily are improper, as it is for the court to determine the voluntary character of the confessions before admitting them in evidence.

DUNCAN and HEARD, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HOSEA W. WELLS, Judge, presiding.

DESTEFANO, MERENSKY & MIRABELLA, and OTTO L. KOLAR, (ROCCO DESTEFANO, and ELWYN E. LONG, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROYCE A. KIDDER, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

James Robert Burks was murdered on Monday night, May 19, 1924, about midnight. On June 19 an indictment was returned in the criminal court of Cook county charging Nicholas Guido, Tony Demio and Margaret Marks with the crime. Mrs. Marks was not put on trial, but on September 29 the other two defendants were put on trial and on October 9 a verdict was returned finding them guilty and fixing their punishment at twenty-five years' imprisonment in the penitentiary. They were sentenced on the verdict and have sued out a writ of error to reverse the judgment.

Burks conducted a hotel or rooming house in the city of Chicago at No. 1921 Sedgwick street, where he lived, occupying the front room on the first floor. About 12:30 in the morning of May 20, 1924, the police at the Hudson avenue police station received a telephone call, which they answered immediately and in a few minutes arrived at 1921 Sedgwick street, where they were met by Mrs. Margaret Marks, who lived in the house. They went into the front room, which Burks occupied, and found the dead body of Burks, fully dressed, lying on the davenport, with the head to the west, the left foot on the floor, the right foot on the davenport, a carpenter's hammer lying about six inches from the left foot, and with a lace curtain twisted around the neck, with two knots in it. His face was blue and he had

no pulse. The officers notified the station and the coroner's physician and remained there until the arrival of the physician. The physician found a bruise or depression of the scalp in the region of the left ear, which might have been caused by a blunt instrument like the hammer. There was a hemorrhage under the scalp but no fracture of the skull. The blood vessels were engorged and the membranes inflamed. On removing the cloth around the neck a depression was found on the side of the neck in the tissues, which were inflamed, and on opening the neck the windpipe was found to contain a frothy, bloody fluid. The tongue was swollen and firmly imbedded between the teeth. The lungs were inflamed and the other organs of the body were congested. In the opinion of the physician the cause of death was strangulation.

Mrs. Margaret Marks, the co-defendant of the plaintiffs in error, had been living in the rooming house, together with her husband, her sister, Mrs. Mercedes Evers, and her sister's husband, between four and five months. She was a waitress employed at Broadway and Devon avenue, her hours of work being from noon until midnight, but she was not working on Monday, May 19, or for three days before that, having been at home sick. She was called as a witness by the People, and testified, without objection, that she paid the rent to Burks on Monday, May 19, between 10:00 and 10:30 in the morning. Mrs. Evers gave her a check for $16 and she gave her $10 back. She then called Burks to her room and asked him if he would cash the check. He assented. She gave him the check, telling him to take out the $12 for the rent, and Burks gave her back four one-dollar bills. It was a green check, from Clark and Devon avenue, where her sister worked. She could not recall the name of the drawer of the check. It was a confectionery place. During her examination she identified the check which was handed to her, and said that Burks took the money out of his trousers pocket, took the check and wrap-

ped it with the money, putting it back into his right-hand trousers pocket. She saw the check afterward, when it was handed to her by a police officer on Saturday of the same week. She testified that Burks came to her room several times during the night of May 19 from 9:00 o'clock to 11:30. At those times her husband was in her room. Later she went to Burks' room to call him. No reason appears for her doing so. He did not answer. She opened the door and walked in with her brother, her husband, and two boys who lived in the building whose names she did not know. None of these were called as witnesses. Burks was lying on the davenport, fully dressed. His face was black. She went to take up his head. The two boys, however, advised her not to touch him but to call the police. She went to the telephone and called the police and stayed beside the body until the police arrived. She did not remember seeing anything around his neck or head and she said nothing about the hammer.

Edward A. Grimm, a police officer, testified that Mr. and Mrs. Marks, Mr. and Mrs. Evers, Low Fredericks, and two other men whose names the officer did not know, were taken to the station that night. Officer Grimm had a conversation with Mrs. Marks after she was taken to the station. On Saturday morning he went with officers Bennett and Mundt to Devon avenue and Clark street, first going to Division and Clark to see Peter Davlantes, who had a confectionery store there, with whom he had a conversation, after which, accompanied by Davlantes, he went to the Devon Trust and Savings Bank, where he talked to Hayden Miller, the cashier, and got the check given by Davlantes to Mrs. Mercedes Evers, which had been paid. He identified the check by his initials placed in the corner and testified that he got it on Saturday, May 24, about 11:00 o'clock in the morning. The check was drawn on the Devon Trust and Savings Bank to the order of Mercedes Evers, signed Davlantes & Co. by Peter N. Davlantes, and indorsed

Mercedes Evers, Nick Scarmeis. None of the parties to this instrument and none of the officers or employees of the bank testified at the trial and no witness testified to any fact tending to show any connection with or knowledge of this check on the part of either defendant.

No witness gave any testimony tending directly to implicate either of the defendants in the crime. The whole case against them consists of their statements alleged to have been made to police officers in whose custody they were detained without any authority of law, and subsequent confessions made in the presence of John Sbarbaro, assistant State's attorney, taken down in shorthand and transcribed in typewriting. The competency of these confessions is the main question in the case. Without them there is no semblance of a case.

The prosecution, after directing the attention of officer Grimm to May 25, 1924, asked him if he had a conversation with the defendant Nicholas Guido, and he answered that he had, at the Hudson avenue police station early on Sunday morning. He was then asked what conversation he had with Guido at that time, and the plaintiffs in error objected to the question on the ground that the confessions were not voluntary. Thereupon the court, out of the presence of the jury, heard the testimony in regard to the statements of the defendants and the circumstances under which they were made, for the purpose of determining whether the statements were admissible. Evidence was introduced on the part of the defense as well as the prosecution and the witnesses were cross-examined. This was the proper course to pursue in such a case. *Bartley* v. *People*, 156 Ill. 234; *Zuckerman* v. *People*, 213 id. 114; *People* v. *Sweeney*, 304 id. 502.

On this hearing by the court, Grimm testified that he had a conversation with Guido, which took place on the morning of May 25 in the captain's office at the Hudson avenue police station; that officers Mundt and Bennett, Cap-

tain Peters, and a few more, were present.  On Saturday
Grimm had got the check from the Devon Trust and Sav-
ings Bank, and about midnight or one o'clock in the morn-
ing Guido was brought into the captain's office, was shown
the check and asked whether he had ever seen it before.
He said no.  Mrs. Marks was brought in and shown the
check, and was asked, in Guido's presence, if she had ever
seen it before.  She answered yes; it was the check she
gave Burks on Monday afternoon in payment of the rent.
About three or four hours later Grimm went back in the
rear and talked to Guido through the bars.  Grimm was
alone with him and a few prisoners there.  He told Guido
that this check was sent in to the bank by a man named
Gore, who got it from a man named Caringello, who ran
a butcher shop around Blue Island avenue and Taylor street;
that it was signed by a restaurant man; that the check came
from Guido's neighborhood and that Guido "done that job
over there."  Guido denied it, and Grimm, saying "all right;
let it go at that," was going out when Guido called him
back and asked for Lieutenant Jensen.  Grimm asked him
what he wanted Jensen for, and Guido said he wanted to
tell him everything.  Jensen was not in the station but on
his return Grimm told him that Guido wanted to talk with
him.  Grimm further testified that after that he had a con-
versation with Tony Demio in the State's attorney's office
about six or seven o'clock the same morning, in a corner of
the private office, and said to Demio, "You see, now, he is
telling everything; you might as well tell us," and Demio
said, "I will tell you the truth."  Demio then told him he
went into this rooming house at 1921 Sedgwick street.  The
first time he went in he heard some noise in there and they
went out.  They met Nick Guido on the corner and told
him there was some argument or something in the house;
that they did not want to do anything there.  Tony Felice
said, "Let's go back again."  They got as far as the door.
They still thought there was something wrong in there.

They went out. They tried again, and when they got to Burks' door he was just opening the door to go into his room. He said, "Step right in; I will have a room for you in a little while." When he stepped into the door Felice pulled out a gun and held it up to his stomach and Demio got in back of him and held his hands and went through his pockets. Burks started to push him away and they threw him on a couch. They grabbed a curtain that was lying on the bed, wrapped it around his neck and both of them started pulling it and tying knots in it. Afterwards, Grimm testified, Demio and Guido were in the State's attorney's office together, and a man by the name of Caringello, the butcher, was brought in, and Demio and Guido said, "That is the fellow we cashed the check by." Grimm did not talk to Demio prior to the morning of May 25. Demio was not brought in until six or seven o'clock that morning. Grimm testified that he talked to Guido on Friday night at the station with reference to this case. Mrs. Marks, officers Bennett and Mundt and Mrs. Parker were present. At that time Guido claimed that he had taken Mrs. Marks out. He said on that particular night he met her at the dry goods store at Center and Lincoln between 11:30 and 12:30, and Mrs. Marks, Grimm said, had been denying it right along, so Grimm brought them together and told Mrs. Marks that Guido said he met her that night on the corner over there, and asked whether he met her or not. She said he did not and he was a liar. Guido was going to hit her but they stopped him.

Thomas Connolly, a police officer, in company with officers Malahey and Deyer, arrested Guido early in the morning of May 22. He had no conversation with Guido at that time at his home or at the Hudson avenue police station, to which he took him, but he testified that on the morning of May 23 he asked Guido if he knew Margaret Marks and questioned him as to his whereabouts the night of May 19. Guido said he was over to see Margaret Marks and met

her at the corner of Sedgwick and Center streets about
10:25. He said she had a black eye. He asked her how
she got that and she said her husband struck her, and when
he left her she went to a drug store to get something for
her eye. Connolly confronted Guido with Mrs. Marks and
asked her, in Guido's presence, if it was right that she met
Guido on that night, and she said no; he was a liar. That
was all Connolly saw of Guido until the following Sunday
morning about five o'clock. At that time Lieutenant Jen-
sen and Captain Peters gave Connolly orders to go to 744
DeKoven street and arrest Demio. Six officers accompanied
him. They went to 744 DeKoven street to a flat on the
second floor in the rear, where they woke up Demio, who
was asleep, told him to dress and took him over to the Hud-
son avenue station. Demio was in custody only about an
hour until he was taken to the State's attorney's office, where
he made a statement. Connolly stated that he never struck,
beat or abused the defendants, nor did any police officer, or
any other person in his presence, strike, beat or abuse them.

Axel Jensen testified that he was a lieutenant of police,
and about three o'clock on the morning of May 25 he saw
Guido at the Hudson avenue station, in the cell house; that
Guido asked him to come in the cell, and he got the lock-up
keeper to let him in. Guido said if Jensen would take him
some other place he would tell the whole truth, and to the
question why he did not tell it there, he said that he had
been bullying the "coppers" at this station and did not want
to see them. Jensen said that he would take him to the near-
est station or anywhere he wanted to go, and Guido said,
"Anywhere but here." Jensen took him to the East Chi-
cago police station and had a conversation with him there.
Guido asked Jensen if he had a piece of paper to write a
name and address down. Guido gave him a name and ad-
dress and Jensen went up-stairs and gave the address to
some officers to go over and arrest Demio. Afterward he
had a further talk with Guido relative to Mrs. Marks and

a person called Dago Tony. Guido said Mrs. Marks was in on it; that she framed it and Dago Tony was in on the job. After that conversation Guido was taken to the State's attorney's office. Neither Guido nor Demio was struck or beaten in any way by Jensen or by any other police officer or anyone else in his presence, and he did not observe any marks of violence on either of them.

Captain Peters and officers Mundt and Laurell were examined on this hearing and testified to being present at one or more conversations with Guido in regard to the murder or to the check, and all of them testified that they did not strike, beat or abuse him and no one else did so in their presence, and that they saw no signs of violence on his person.

John Sbarbaro testified that he was an assistant State's attorney and on Sunday morning, May 25, 1925, he saw the defendants, Demio and Guido, and had a conversation with them in the office of the State's attorney. Captain Peters and one or two other officers and the court reporter were present. The defendants appeared to be perfectly normal, physically, and made no complaint that they were ill-treated. Sbarbaro advised them of their legal rights; that they were in the office of the State's attorney and that they did not have to talk if they did not want to. He asked them if they were willing to make a free and voluntary statement. They said they understood that, and they made their statements, which were taken down in shorthand.

The plaintiffs in error testified as to their treatment by the police officers at the station. Guido, after he was taken into custody on Wednesday night, was at the Hudson avenue station until Sunday morning, when he was taken to the East Chicago avenue station, as testified to by Jensen. During this time he was subjected to interrogation by Connolly, Grimm and Mundt in the presence of other officers at various times. He testified to ten interviews in which he was questioned regarding the murder, in most of which he was severely beaten or otherwise maltreated and threatened

with further violence or death. He stated that from Thursday night until Monday morning he was questioned every half hour, and on his refusal to admit any knowledge of the crime he was beaten with fists, with a sand-bag, punched in the ribs, knocked down and kicked in the stomach until he was unconscious, then water was thrown on him, and after a short respite the process was repeated; that he was refused water to drink and had nothing to eat from Thursday night until the next Tuesday. He qualified this statement later by saying that he would not eat the sausage and bread (the regular prison fare) which was furnished him, and that they refused his request to send out for food, which he was willing and had the money to pay for. The cruel treatment which he received at the hands of officers Connolly, Grimm and Mundt at many interviews was narrated in great detail. In regard to the interview with Jensen on Sunday morning, Guido testified that he did not call for Jensen and ask him to come down or say that he wanted to talk with him, but Jensen came down and told him he had better talk about the case if he knew what was good for him; that these guys would slug him. When Guido said he did not know anything, Jensen went up-stairs and Connolly, Grimm and Mundt came in and started beating him, punching him in the ribs and behind the neck and kicking him all over the cell. Finally they left him alone, and Jensen came down and said if Guido would talk to him about the case he would make it good for him; maybe he would get him out on bond or put him on probation. He then went up-stairs and left Guido alone about fifteen minutes, when he came back with a piece of paper and read him a statement, saying, "You better tell the officers everything now before they come down and slug you again, as they did before." Then Guido got scared and told Jensen he would say anything, and he was taken to the East Chicago avenue station and put in a cell there. Before he was brought down to the State's attorney's office Jensen told him what he

should say, telling him to tell the officers down at the State's attorney's office what he had got on the slip of paper and Jensen would get him out on probation. Guido told Jensen he would do anything for him, and he was then taken to the State's attorney's office, where he told the story the officers told him to tell Sbarbaro. He did not tell Sbarbaro that the officers told him to tell that story for fear they would beat him up again. Sbarbaro never talked to him alone and did not ask him if the police had beat him up and Guido did not answer no. Mundt, Connolly and Grimm were the only police who beat him. Neither Deyer, Malahey nor Laurell beat him up.

Demio was not arrested until about five o'clock Sunday morning, when he was taken to the Hudson avenue station, where he was put in a cell. A few minutes later he was taken by officer Connolly up-stairs to a little room where there were four other officers. The windows were closed, the shades pulled down, the light put out. He was asked about the Burks case, and on his denying any knowledge of it was beaten and knocked unconscious and his lip was cut open. This treatment was continued for an hour and a half, his life was threatened, and finally he consented to say what they wanted him to. They took him to the State's attorney's office, and Connolly and another officer told him what they expected him to do, and if he wouldn't say what they had read to him they were going to take him back and finish the work right. He did not say anything to Sbarbaro about having been beaten earlier in the morning, because the officers told him he should not mention anything about it. Connolly, Mundt, Grimm and Laurell, the officers whom Demio named as engaging in this treatment of him, denied all his statements as to his treatment.

When the plaintiffs in error were taken to the county jail they were required to take a bath. They testified that there were visible bruises on their bodies, caused by the beatings which they had received. Two other prisoners who

were received at the same time corroborated their testimony as to the bruises and discoloration on their hips, chests and necks.   Dr. O'Halloran, the jail physician, testified that he made a physical examination of the plaintiffs in error on their admission to the jail and found no marks, bruises or contusions on their necks, backs or bodies.   He testified that he did not know from memory the physical condition of the prisoners when he made the examination, but he did remember the examination, and the cards and charts which constitute the jail record of the prisoners and bore his signature were shown to him and from them he testified.

The three lock-up keepers who had charge of the Hudson avenue station testified that food was given to Guido regularly three times a day during the time he was held at the station, and one of them testified that on Saturday he sent out and got food for Guido, for which Guido paid.

The substance of Guido's confession made in the State's attorney's office to John M. Sbarbaro, an assistant State's attorney, was that he had met Margaret Marks, flirted with her and kept company with her three or four times a week; that about May 6 she wanted to leave her husband and wanted Guido to get some money and take her away.   She told him that Burks got money almost every day and wanted Guido to get money from Burks.   He said he could not do it but would get somebody who would if she had to have the money.   On May 17 he told Demio of the plan, but Demio had another engagement.   On the evening of the 19th he met Demio by appointment at the Roma restaurant and then went home and got a gun and brought it to the restaurant. Mrs. Marks telephoned to him that her husband had beaten her and she wanted to talk to him, and he went out to see her.   Her eye was black.   He went back to the restaurant, and the two, with a third, whom they called Dago Tony, got on a street car to go to 1921 Sedgwick street.   While on the street car Guido told them to go up-stairs into the hall and to the first door on the right, which was Burks'

room. After they left the street car the other two went down one side of the street and Guido on the other. As they came to the house Guido nodded to them, but they did not go in and the three met at the next corner. They went back, and the other two went in and remained about five minutes. Guido saw them come out. Demio said there was a lot of noise and excitement in there. Guido told them to go ahead, and the two went in again and remained about ten minutes. They then got in a cab and while in it counted the proceeds of the robbery. There were one twenty, two ten, two five and some one-dollar bills and a little more than a dollar in change, a check for $16 and a check for $6.50. They rode to a restaurant and divided the money, each of the other two taking $15, Guido taking $17 for himself and $5 for Mrs. Marks. Guido telephoned to Mrs. Marks and told her he wanted to see her, and they met at one o'clock outside the dry goods store on Sedgwick street. He told her they had pulled off the job and he would see her the next day. She said, "What have you done to Burks?" and he said, "Go to the door and find out; go and see what is the matter with Burks." The check for $16 was cashed the following night by Nick Scarmeis. The check for $6.50 was torn up. Guido got $8 of the larger check.

Demio in his statement said that he and Dago Tony went into the hall, and Burks was there and said, "Hello, boys!" They said, "Good evening," and Burks said, "Just a minute and I will get you a room." Dago Tony then stuck the gun in Burks' stomach and told him to back into the room, which he did, and Demio took the money out of his pocket. Dago Tony put the gun in his pocket and Burks jumped on him and started a fight and demanded his money back. As Demio went out the door Dago Tony got a towel. Demio told him to let the towel alone and get out. Dago Tony told him to wait a little and not go yet, but Demio went on out. Dago Tony afterward came out and told Demio that he had had a fight with Burks and had tied him up with a

towel around the neck.   It was a turkish towel that Demio
saw him have.   In the division of the money each got $19
except Guido, who got $5 more.

At the conclusion of the evidence heard by the court out
of the presence of the jury the court overruled the defend-
ants' objection, the jury were recalled and the witnesses re-
peated to the jury the testimony which had been heard by
the court.   On objection made to the admissions or confes-
sions of the plaintiffs in error it was the duty of the court
to hear, out of the presence of the jury, such evidence as
either side offered as to the circumstances under which the
confessions were made, with a view to determine whether
they were voluntarily made or not.   This preliminary ques-
tion as to the competency of the admissions it was the duty
of the court to decide, in the first place, from the evidence,
and it was not necessary that he should be convinced, beyond
a reasonable doubt, of their voluntary character.   While he
might not disregard the evidence of the defendants or testi-
mony in their behalf that the confessions were forced from
them by torture or physical violence, his decision will not
be reversed except where there has been an abuse of discre-
tion and the decision is manifestly against the weight of the
evidence.   (*People* v. *Fox*, 319 Ill. 606; *People* v. *Sweeney,*
*supra; Hopt* v. *Utah,* 110 U. S. 572.)   Though there may
be evidence of threats or promises made to induce the mak-
ing of the confession, if there is sufficient in the facts and
circumstances proved to show that the confession was vol-
untarily made there can be no abuse of judicial discretion
in allowing it to be presented to the jury.   (*Bartley* v. *Peo-
ple, supra.*)   The evidence was contradictory.   All the offi-
cers whom the plaintiffs in error charged in their testimony
with the exercise of physical violence and threats denied
these charges and testified that they did not do the things
charged and that nothing of the kind occurred in their pres-
ence.   The court saw and heard the witnesses and we agree

with his conclusion. There was no error in admitting the confessions in evidence.

The plaintiffs in error, in their testimony in the presence of the jury, denied any connection with or knowledge of the crime and introduced evidence tending to show an alibi so far as Guido was concerned. Angelo Armandi and John Falato testified that they were with Guido at Scarmeis' restaurant, 1002 West Taylor street, on May 19, from 8:30 in the evening until about 10:00 o'clock; that they left the restaurant about 10:00 o'clock and went in the direction of Guido's home, passing Armandi's house first, and there Armandi went into the house. Falato went on home with Guido and left Guido there. Guido's mother testified that he came home at 10:20 and smoked a cigarette. She saw him retire for the night and he did not leave the house that night. Salvatores Sarpelli, who lived in Guido's home, saw Guido there the night of May 19. Guido was in the house before Sarpelli got there, after 10:00 o'clock. Guido went up-stairs to bed and Sarpelli did not see him after that. Sarpelli fixed the date by the fact that he went to work for the National Biscuit Company on that day, Monday, May 19. Both the plaintiffs in error also introduced evidence tending to show their good character.

The evidence on the whole case was conflicting. The commission of the crime was established without regard to the confessions, and the confessions, if true, established the identity of the defendants as the persons who committed the crime. They denied the truth of the confessions, but it was the province of the jury to decide the question of fact, and where the *corpus delicti* is proved by evidence independent of the confession a defendant may be convicted by evidence of his confession. (*South* v. *People,* 98 Ill. 261; *Andrews* v. *People,* 117 id. 195.) There was evidence to sustain the verdict of guilty, and we cannot say that there clearly was a reasonable doubt of the defendants' guilt.

The plaintiffs in error contend that the court erred in several of the instructions given to the jury at the request of the People and in refusing to give instructions asked by the plaintiffs in error. The fourth instruction given for the People was as follows:

"The court instructs the jury, as a matter of law, that, to constitute the offense charged in this case, the intent alleged in the indictment is necessary to be shown, but that direct and positive testimony is not necessary to prove the intent; it may be inferred from the facts and circumstances shown by the evidence. And if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant committed the assault as alleged in the indictment, and if you further find from the evidence in this case, beyond a reasonable doubt, that such assault was committed deliberately and was likely to be attended with dangerous consequences, the malice or intent requisite to make out the case as charged will be presumed."

It was not correct to say that the intent alleged in the indictment is necessary to be shown, because the indictment alleged no intent. Intent to kill does not enter into the definition of murder, and on a trial for murder it is sufficient to prove an unlawful killing with malice aforethought, and this means that it is sufficient to prove general malice as distinguished from a specific intent to kill. (*People* v. *Heffernan*, 312 Ill. 66; *Adams* v. *People*, 109 id. 444.) The error in the first sentence of the instruction in referring to the intent alleged in the indictment where no intent was alleged could not, however, prejudice the defendants, and the proposition stated in the second sentence is not erroneous.

Instruction No. 8 was as follows:

"The court instructs the jury, as a matter of law, that if several persons conspire to do an unlawful act and death occurs in the prosecution of the common object, all are alike guilty of the homicide. The act of one of them done in

furtherance of the common design is, in the consideration of the law, the act of all; and he who being present aids, abets, assists, advises or encourages, or not being present hath advised or encouraged another to do an illegal act, is responsible for all the natural and probable consequences that may arise from its perpetration."

The objection made to the instruction is, that it is only applicable when a conspiracy is charged in the indictment. If two or more persons agree together for the purpose of committing a crime all are responsible for the act of each done in carrying out the common purpose, and the use of the word "conspire" instead of "agree together" does not render the instruction erroneous, even though a conspiracy was not charged in the indictment. *People* v. *Anderson,* 239 Ill. 168.

The ninth instruction was the same as the ninth instruction in the case of *People* v. *Costello,* 320 Ill. 79, and it was there held that the statement that the doubt sufficient to authorize an acquittal must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case not necessary to constitute the crime charged, ought not to be made without in some way definitely informing the jury what are the essential material facts constituting the crime with which the defendant is charged, citing previous decisions, in one of which, *People* v. *Cramer,* 298 Ill. 509, it was said: "Whether such an instruction would be ground for reversal might depend upon the state of the record, which might or might not raise an inference that the jury had been mistaken in their view of the law as to what was material." The jury could not have been misled by the instruction in this case. The crime itself was proved without question. The record presents no question as to any particular fact in the case not necessary to constitute the crime charged. The only question in the case was as to the identity of the plaintiffs in error as the persons committing the crime. There was no reason for giving this in-

struction in this case, but in the condition of the record it could not have done the defendants any harm.

Instruction No. 11 is the same as instruction No. 11 in the case of *Spies* v. *People,* 122 Ill. 1, which is found on page 82 of that volume. It concerns the presumption of innocence and has been approved also in *People* v. *Scarbak,* 245 Ill. 435, and *People* v. *Rees,* 268 id. 585, and it was not error to give it to the jury.

The twelfth and thirteenth instructions were as follows:

12. "Circumstantial evidence in criminal cases is the proof of such facts and circumstances connected with or surrounding the commission of the crime charged as tend to show the guilt or innocence of the party charged, and if the facts and circumstances shown by the evidence in this case are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding the defendant guilty. The law demands a conviction wherever there is sufficient legal evidence to show the defendant's guilt beyond a reasonable doubt, and circumstantial evidence is legal evidence."

13. "The jury are instructed, as a matter of law, that circumstantial evidence is competent, legal evidence, and if the minds of the jury are convinced of the truth of the charge in the indictment in this case beyond a reasonable doubt, from facts and circumstances in proof, this is sufficient to authorize a conviction."

The first of these instructions is supported by *Parsons* v. *People,* 218 Ill. 386, and the second is merely a repetition of a portion of the first. The plaintiffs in error argue that there was no circumstantial evidence in the case which could be considered as tending to connect the plaintiffs in error with the crime. All the circumstantial evidence in the case, as we have said, would not, of itself, tend to prove the plaintiffs in error guilty of the crime, but there were circumstances shown to which these instructions applied

which were important links, in connection with the direct evidence of the confessions, to convince the jury of the truth of the confessions and the guilt of the defendants. Those circumstances were the fact that Burks received the check for $16 the day he was murdered, rolled it up with his money and put it in his pocket; that afterward it was paid by the bank on a forged indorsement; that Guido was at the house 1921 Sedgwick street on May 19, the day of the murder; that he had been in the habit of coming there daily; that while there on May 19 he made a call on the telephone of Marie Parker for "Tony the Woman," and told him in English to bring a couple of boys and meet Guido at the same place, and to tell Guido's brother to go home and in his mother's room, on the door, was his coat, and in the pocket —. From then on he spoke in Italian, which Mrs. Parker, the witness, did not understand, and then in English said, "Bring it to me; I will meet you on the corner." This evidence was contradicted, but it was for the jury to determine its truth. While of themselves these circumstances had no tendency to prove the plaintiffs in error's connection with the crime, they were circumstances which constituted legal evidence for the jury to consider in connection with the confessions. The instructions properly told the jury that if the facts and circumstances shown by the evidence were sufficient to satisfy the jury of the guilt of the defendants beyond a reasonable doubt, then it was sufficient to authorize the jury to find the defendants guilty. The facts and circumstances mentioned in the instruction referred not alone to the circumstantial evidence but to all the evidence in the case.

Instruction No. 14 was as follows:

"The court instructs the jury as a matter of law, that where the *corpus delicti* has been proven beyond a reasonable doubt, independently of the confession, and the proof satisfies the jury that the confession is true, it is sufficient under the rules of evidence in this State to justify a verdict

of guilty, if the jury believe beyond a reasonable doubt that such confession was not obtained by reason of threats or promises made by someone in authority.

The instruction is supported by *People* v. *Grant,* 313 Ill. 69, but it is said that no criticism was made of it in that case as not defining *"corpus delicti"* and as not instructing the jury that the proof must not only satisfy the jury that the confession was true but also that it was voluntary. Perhaps there might be a case where, in giving this instruction, it would be necessary to define *"corpus delicti,"* but the failure to define it in this case, where the only controversy in the case was over the confessions, could not have been injurious to the defendants. The instruction was more favorable to the defendants than they were entitled to, in requiring proof, beyond a reasonable doubt, that the confessions were not obtained by reason of threats or promises made by someone in authority.

The fifteenth instruction told the jury that it was their duty to treat and consider any confession made by the defendants precisely as any other testimony; that if they believed the whole confession to be voluntary and true they should act upon the whole as true, but they might believe that which charges the defendant and reject that which is in his favor if they saw sufficient grounds in the evidence for doing so or found any inherent improbability in the confessions, but the jury were at liberty to judge of it by the other evidence and by all the circumstances in the case. It is contended that no other evidence should be considered in connection with the confession except the *res gestæ* at the time the confessions were made and the circumstances and facts that actuated the confessions. While it is the rule that where the declarations of a party are given in evidence against him his whole statement must be received in evidence, it is not true that the declarations are necessarily to be accepted as true or rejected as false by the jury in their entirety. The jury have the right to consider such state-

321–27

ments the same as any other competent statement of a witness, in connection with all the other evidence in the case tending to support or contradict it, and to give credence to such part of the statements as upon such consideration they find to be true and to reject such part as they find to be untrue. (*Hanrahan* v. *People,* 91 Ill. 142.) The instruction would have been more accurate if instead of telling the jury that they "might believe that which charges the defendant and reject that which is in his favor" it had stated that the jury might accept any part of the confessions as true and reject any part as false if they saw sufficient grounds in the evidence for so doing, but in the condition of the evidence in this record the jury could not have been misled by the instruction in their consideration of the confessions.

Instruction No. 16, on the defense of alibi, was as follows:

"The court instructs the jury that before a defendant can avail himself of the defense of an alibi, the proof must cover the whole of the time of the commission of the crime, so as to render it impossible, or highly improbable, that the defendant could have committed the act, and unless the proof in a case covers the whole time, so as to render the commission of the crime by a defendant impossible or highly improbable, then that defense is not available to such defendant."

This instruction says nothing about the burden of proof or the quantum of proof. It is not subject to the criticism that the burden of proof of the alibi is placed on the defendants, or that it must be proved beyond a reasonable doubt or even by a preponderance of the evidence. The single purpose of the instruction was to indicate to the jury that the evidence, to enable the defendant to have the benefit of the defense, must cover the time of the commission of the crime so completely as to render its commission by the defendant impossible or at least highly improbable. While the instruction uses the phrase "the whole time," that phrase

is immediately limited by the words "so as to render the commission of the crime by a defendant impossible or highly improbable." Certainly, evidence which leaves it not only possible but highly probable that the defendant committed the crime cannot be the basis of a reasonable doubt that he did so.

The court at the request of the plaintiffs in error gave two instructions (Nos. 12 and 13) on the question of the quantum of proof and burden of proof of an alibi, in which it was correctly stated that it is not necessary for the defendants to produce evidence satisfactory to cover the whole time of the transaction in question, so as to render it impossible that they could have committed the act; but the defense of an alibi is sufficient and proper in law if the proof covers part of the time when said crime was committed, so as to render it highly improbable, and almost impossible, that the defendants could have committed the act as charged; and it is not necessary that the jury should be absolutely convinced of the truth of the alibi; it is enough if the proof introduced in support of the alibi produces such a probability of its truth as to cause the jury to entertain a reasonable doubt of the charge upon which the defendant is arraigned; the burden of proving the defendant guilty in a criminal case rests at all times upon the State, and the defendant is not required by his defense of an alibi to prove the alibi to the satisfaction of the jury and beyond a reasonable doubt. These two instructions are not contradictory of the People's instruction No. 16 but are supplementary to it and cover a wider field. The three instructions together fully and correctly informed the jury as to the defense of alibi, the burden of proof and the requisite quantum of proof.

The plaintiffs in error further contend that the court erred also in refusing to give five instructions, being instructions numbered 3, 4, 5, 6 and 7 requested by the defendants. These instructions referred to the duty of the jury in the consideration of the confessions of the defend-

ants. The third stated that if a confession was admitted in evidence the procurement of which tended to show unlawful means used and that it was not a voluntary acknowledgment of the crime by the defendant, it was the duty of the jury to entirely disregard the confession and not be influenced by it in arriving at their verdict. The other four require the jury to entirely disregard the confessions unless they are satisfied from the evidence, beyond a reasonable doubt, that they were voluntary. It is the duty of the jury to consider all the evidence which the court has admitted as competent for their consideration, and they have no right to disregard the evidence of any admission or confession which the court has permitted them to hear. But they are the exclusive judges of the credibility of the confessions and the weight which should be given them as proof. They may take into consideration all the circumstances in evidence in regard to the making of the confessions in determining their truth or falsity, but they may not entirely disregard them. Whether the confessions are of such a character as to entitle them to be considered by the jury is a question for the court. Whether they are true or false or partly true and partly false is a question for the jury. When confessions or admissions have been admitted in evidence the jury cannot disregard them but are bound to consider and weigh them and give them such credit as they may be entitled to in the judgment of the jury. The statement that it is the duty of the jury to disregard confessions unless they are satisfied beyond a reasonable doubt that they were made freely and voluntarily is contrary to the law as heretofore stated in this opinion. *People* v. *Fox, supra; People* v. *Costello, supra; People* v. *Calseg,* 311 Ill. 365.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*

DUNCAN and HEARD, JJ., dissenting.